Maryland and Phœnix Insurance Companies *vs.* Bathurst.—1833.

---

THE MARYLAND INSURANCE COMPANY, AND PHŒNIX FIRE INSURANCE COMPANY *vs.* BATHURST, surviving Partner of THOMPSON.—*June,* 1833.

The *sentence* of condemnation of a foreign prize court is evidence of the facts which it purports to decide, in an action on a policy of insurance on the thing condemned, and was conclusive evidence thereof, until the act of 1813, *ch.* 164, reduced it to the character of *prima facie* proof ; but the proof upon which such sentence may have been predicated, is not, *per se,* admissible in such collateral action.

The record of the proceedings of a foreign court of admiralty, containing copies of various documents, and reciting the proofs of the originals thereof being found on board of a vessel, condemned by such court, at the time of

her capture, is not evidence that such documents were so found, in an action upon a policy of insurance to recover the value of the condemned vessel.

Where the sentence of a Court of Admiralty condemning a vessel, recited that *at the date of the decree,* the port which such vessel had attempted to enter was blockaded, evidence that *at the time of her capture,* such port was not in fact blockaded is immaterial and irrelevant, in an action upon a policy to recover for a total loss arising from the condemnation, and although the County Court permitted such evidence after objection to go to the jury, yet it is not error for which this court would reverse the judgment.

The party who offers the decree of a foreign Court of Admirality in evidence, as proof of the loss of his vessel condemned thereby, may, since the act of 1813, contradict by proof, the facts and circumstances upon which such decree professes to be founded, where such facts are in issue between the parties to the cause in which the contradictory proof is offered.

Where the insured is informed of the loss of his vessel by capture, he need not abandon to the underwriter: but may wait to ascertain whether his property is condemned, and then claim to be paid.

If in a reasonable time after notice of capture, the insured fails to abandon, he loses the privilege of doing so, and cannot recover for a total loss on any abandonment for that cause subsequently made.

In recovering for a total loss founded upon an abandonment, the insured must prove as the basis of his action, the cause assigned in the notice of abandonment.

An order for insurance against all risks for account of whom it may concern covers belligerent as well as neutral risks; and an endorsement upon such an order, stating, "although our advices give us no reason to believe that there will be any articles contraband of war on board, still as we wish to be covered against all possible risk, we request your re-consideration of the within, including articles contraband of war," does not alter the character of the original application, nor constitute a warranty or representation of neutrality.

A court of justice may, in its discretion, content itself with a simple refusal of any prayer not sanctioned by the rules of law.

Facts of universal notoriety in the commercial world, at the time of effecting an insurance upon a particular voyage, which relate to the course of trade upon such voyage, which form a part of the public history of that time, are lights, against which a court of justice cannot shut its eyes, and of which the law imputes knowledge to underwriters.

Where an order for insurance is against all risks, or all possible risks for account of whom it may concern, upon a certain defined voyage, the insured is not bound to communicate or disclose at the time of effecting such insurance without inquiry from the underwriter, the particular circumstances connected with the voyage, which show that it is in fact a belligerent risk, as the transportation of hostile stores, troops, &c.

The obligation to disclose facts to an underwriter, is limited to such facts as would vary the risk or nature of the contract; no communication need be made of what is necessarily implied by the contract.

The *English* rule, that the right to recover for a total loss is not made absolute by the state of the facts on which the abandonment is founded, continuing to exist at the date of the abandonment, but is dependent on subsequent events, does not prevail here.

The right to recover of the assurer for a total loss is complete, if the loss, which is the basis of an abandonment, continues at the time of the abandonment, and of this consummate right or privilege, the assured cannot without default be deprived, but by his consent expressed or implied. It may be waived like other privileges.

If after capture and abandonment, but before condemnation, a ship be ransomed by the captain, or re-taken by the crew, or be recovered and delivered to the owners who claim and use her as their own, they possess her under no new title or right of property; and this constitutes a waiver or surrender of the abandonment.

But where a condemnation takes place, the assured, apart from all statutory regulation on the subject, is divested of all property in the ship; and in it, if purchased by themselves or their agents, they acquire a new and independent title, to which their subsequent acts of ownership are imputable, and not to their original proprietary rights. And this new title, against all the world save the underwriters, is incontrovertible; and it is conclusive against them, if they consented to its acquisition, or have waived the right to impeach it.

So where the insured vessel was captured and condemned, and purchased by the master, who drew upon his owners for the amount, and information of these facts was communicated to the underwriters at the time of making a claim for a total loss, and the underwriters did not claim the purchase, but contested their liability upon the ground of not having seen the protest of the captain; it was HELD, that they had waived their right to consider the purchase as made for their account, and could not at the trial insist that the insured had only suffered a partial loss, but were liable for a total loss.

Where notice was given to underwriters of a claim for the condemnation of the insured vessel, and they at first demanded the captain's protest, and after some correspondence the underwriters notified the insured that " they did not consider themselves answerable for the claim," this was HELD, to be a waiver of all objection to the preliminary proofs offered by the assured.

CROSS APPEALS from *Baltimore* County Court.

These were actions of *Covenant* instituted by *Thompson & Bathurst*, against the Insurance Companies, on the 17th

March, 1824. *Thompson* died pending the causes. Issues were joined upon the pleas of *non infregit conventionem*.

The following statement is from the record in the case of the *Maryland* Insurance Company, from which the other is not supposed in principle to be distinguishable. These causes were argued, and decided together in the Court of Appeals.

1. At the trial the plaintiff read in evidence to the jury, the following policy of insurance.

"By the *Maryland* Insurance Company, (No. 8881.) Whereas *Thompson & Bathurst*, for whom it may concern, do make insurance, and cause themselves to be insured, lost or not lost, at and from *London* or *Antwerp* to two ports on the *Spanish Main*, and at and from thence to a port in the *United States*, upon the body tackle, &c. and freight of the good ship called the *Budget*, whereof is master *John Meany*, or, &c. beginning the adventure upon the said vessel, &c. at and from *London* or *Antwerp* aforesaid, and so shall continue and endure until the said vessel be safely arrived at a port in the *United States* aforesaid, and until she be moored twenty-four hours in good safety. And it shall and may be lawful for the said vessel in her voyage, to proceed and sail to, touch and stay at any ports or places, if thereto obliged by stress of weather or other unavoidable accident, without prejudice to this insurance. The said vessel, her tackle, &c. for so much as it concerns the assured, by agreement made between the assured *and assurers,* in this policy, are and shall be valued at          without any further account to be given by the assured and the assurers, or any of them for the same. Touching the adventures and perils which we the assurers are contented to bear and take upon ourselves in this voyage, they are of the seas, men of war, fires, &c. taking at sea, arrests, &c. all kings, people of, &c. barratry of the master and mariners, and all other perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage of the said vessel, or any part thereof. And in case of any loss or misfortune, it shall be lawful to and for the assured, their

factors, servants and assigns, (and the assured on their part agree and engage by themselves, their factors, servants or assigns) to sue, labor and travel for, in and about the defence, safeguard and recovery of the said vessel, or any part thereof, without prejudice to this insurance,—to the charges whereof, we the assurers will contribute according to the rate and quantity of the sum herein insured. And so we the assurers are contented, and do hereby bind the *Maryland* Insurance Company to the assured, their executors, administrators and assigns, for the true performance of the premises, confessing ourselves paid the consideration due unto us for the assurance, by the said assured, or their assigns, after the rate of ten per cent. to return five per cent. if the risk end at the first port; if at the second, two and one-half per cent. On vessel, $3,000—valued at ten thousand dollars. On freight, 2,000—or the proceeds thereof valued at four thousand dollars—$5,000. And in case of loss, such loss to be paid in ninety days after proof and adjustment thereof; the amount of the note given for the premium, if unpaid, being first deducted. In witness whereof, the *Maryland* Insurance Company have, by their president, subscribed the sum insured, and caused the common seal to be annexed to these presents, in *Baltimore*, the 10th day of October, one thousand eight hundred and twenty-two.

"MEMORANDUM.—1. It is agreed by and between the assured and assurers, that no loss shall be paid on any average under five per cent., unless said average be general. 2. It is further agreed, that if any dispute shall arise relating to a loss on this policy, it shall be referred to two persons, one to be chosen by the assured, and the other by the president of the *Maryland* Insurance Company, for the time being, which two persons shall have the power to adjust the same ; but in case they cannot agree, then these two persons shall choose a third, and any two of them agreeing, their determination shall be obligatory on both parties. 3. If the above vessel, after a regular survey, shall

be condemned for being unsound or rotten, the company shall not be bound to pay their subscriptions to this policy. 4. It is also agreed between the assured and assurers, that in all cases of return premium, one-half per cent. upon the sum insured, shall be retained by the assurers. 5. It is mutually agreed by the parties to this policy, that no part of the premium shall be returned or abated, on account of any deviation which shall be made by the owners or their factors, from the present voyage. 6. Warranted by the assured free from any charge, damage or loss, which may arise in consequence of seizure or detention of the property, for or on account of any illicit or prohibited trade. And in case of capture or detention, the assured renounces all claim against the company for damage, seamen's wages or provisions : and should the said ship not be heard of within twelve months from the time she leaves her last port, then she shall be deemed a loss, which the company engages to pay without further delay.—($5,000.)—Five thousand dollars.   *John Hollins*, Prest. "

And the order on which the same was founded, which is in the following words :—"Extract of a letter received from Capt. *John Meany*, of the ship *Budget*, dated *London*, 3d and 4th September, 1822.   I have chartered the ship to go from this *port* or *Antwerp*, to one of the following ports in the *Colombian* government—*Laguira, Porto Cabello, Santa Martha*, or *Carthagena*.   We commence loading this day, and will dispatch immediately.   The ship is in complete order—stands A, No. 1 at *Lloyd's*—has been docked, caulked all over, coppered with 24 oz. copper—has two suits of sails, one almost new ; 4 anchors, and 4 cables, two of the cables chain.   She has been put in complete order in rigging, &c.   If she should go to *Antwerp*, which is not probable, I will get the insurance done here ; so that you will make the insurance from either of those ports,—say $8,000 on ship, and $2,000 on freight.   As some freight may offer at *Laguira*, that would prevent my returning to the *United States*—in that case there should be a return premium."

"Insurance is wanted as above, *against all risks, for account of all whom it may concern,* and in case of loss, the amount to be paid *us* on the above named ship *Budget*, $8,000, valued at $10,000, and freight $2000, or the proceeds thereof, at and from *London* or *Antwerp*, to one or two of the above named ports on the *Spanish Main*, and at and from thence to a port in the *United States*, expected to be *Baltimore*. What return if only one port on the *Spanish Main* is used, and what return, should the risk end there? *Thompson & Bathurst. Baltimore*, Oct. 9th, 1822. "*Answer.*" Freight valued at $4,000; 10 per cent—to return 5 per cent. if the risk end at the first port; if at the second, 2½ per cent."

Which said order, with the offer of the defendants noted thereon, was on the following day, to wit: the 10th October, again presented to the defendants by the plaintiffs, with the following endorsement:—"Although our advices give us no reason to believe there will be any articles contraband of war, on board the ship *Budget*, still, *as we wish to be covered against all possible risk,* we request your reconsideration of the within application, including articles contraband of war. *T. & B.* October 10th."

To which an answer was returned by the defendants in the following words, written on said order, viz: "As yesterday, including articles of war, $3,000 on the vessel—$2,000 on the freight."

And the same was accepted by the plaintiffs, in the following words, viz: "$5000 is accepted. *T. & B.*"

And the plaintiff also gave in evidence the following letters, which were admitted to be the whole correspondence between the parties.

"*Baltimore*, 12th March, 1823. To the President and Directors of the *Maryland* Insurance Company,—Gentlemen: Having received advice from Captain *Meany*, that he had purchased the ship *Budget*, after her being condemned and drawn on us for amount of costs and disbursements,

Maryland and Phœnix Insurance Companies *vs.* Bathurst.—1833.

we wish to know if we may calculate on receiving from you the amount insured in your office, at the stipulated time expressed in your policy—say 90 days from proof of loss. We remain, most respectfully, your obed't servants, *Thompson & Bathurst.*"

" Office of the *Maryland* Insurance Co. 12th March, 1823.—Gentlemen: In reply to your note of this date, we have only to state, that not having seen Captain *Meany's* protest, we cannot satisfactorily make you a reply, because on it mainly depends the ground for payment, which (when presented) if found in order, the loss is payable in ninety days after proof and adjustment thereof. Very respectfully, &c. *John Hollins,* President. (Endorsed) "Messrs. *Thompson & Bathurst, Baltimore.*"

"*Baltimore,* May 7th, 1823. To the President and Directors of the *Maryland* Insurance Co.—Gentlemen: We abandoned to you on the 6th February last, the ship and freight of ship *Budget,* insured in your office by policy No. 8881, and at same time handed you a certified copy of the condemnation of said ship at *Porto Rico.* The period of time required by your policy for payment of loss, after proof thereof, having now expired, we beg leave to call upon you for the amount thereof. We remain, gentlemen, your obedient servants, *Thompson & Bathurst.*"

"7th May, 1823. Messrs. *Thompson & Bathurst,*—Your favor of this day has been received, and has had the attention of the board of directors, in reply to which they refer to their note to you of the 12th March past, respecting the claim you call for, on the ship *Budget* and freight insured by this company in policy No. 8881. Being still without a protest and copy of the proceedings of the court at *Porto Rico,* no claim can possibly lay against us; *but as the vessel is now here, no doubt they can be produced.* It is important also to see the log book. *Jno. Hollins,* President."

"*Baltimore,* 21st May, 1823. To the President and Directors of the *Maryland* Insurance Co.—Gentlemen: Having handed you all the documents we have received, re-

specting the capture of the ship *Budget*, insured in your office, and which we presume you will find conclusive, we have now to request you will arrange and settle with us for the loss. Should you deem any other documents as necessary to *elucidate* the condemnation of the ship, by your pointing them out to us, we will undertake to get them within a reasonable time, if it be possible to procure them. We remain with respect, your obed't servants,

*Thompson & Bathurst.*"

"24th May, 1823. Messrs. *Thompson & Bathurst*,—Your letter of the 21st inst. has had the attention of a full board of directors, who have instructed me to inform you that they will advance to you $4,498.75, on receipt of your and *R. Oliver's*, Esq. joint note at six months, bearing interest; at the expiration of which time, or sooner if convenient, you are required to produce to this company the following documents, relative to the ship *Budget*, viz: the proceedings of the court at *Porto Rico*, the *log book*, or an authenticated copy thereof; the charter party, or copy authenticated; upon the receipt of which, and their proving satisfactory, an adjustment of the loss will take place.

*Jno. Hollins*, President."

"*Baltimore*, 26th May, 1823. To the President and Directors of the *Maryland* Insurance Co.—Gentlemen: We have received your respected letter of the 24th inst. to which we pay due note. Although we consider the proofs already handed you as fully establishing the capture and condemnation of the ship *Budget*, still we do not hesitate in trying to procure the documents you have pointed out as necessary, and have therefore written for them by a vessel that sailed yesterday for *Porto Rico*.

We should esteem it an accommodation, your now paying us the loss in the same manner the *Phœnix* Insurance Company have done, viz: by our giving our note for the same at six months date, with interest, being as a security for our procuring such further documents as may be requisite; but we prefer forfeiting that temporary advantage to giving

a note in the manner you prescribe.   We remain with re-spect, gentlemen, your obed't serv'ts,   *Thompson & Ba-thurst.*"

28th May, 1823.   Messrs. *Thompson & Bathurst,*—Your respects of the 26th instant have had the attention of the Directors of this company, who have instructed me to in-form you, that the proofs produced in the case of the ship *Budget,* are not satisfactory, or such as are usually pro-duced by the assured in similar cases, to entitle the assured to claim a total loss; on that score, we beg to refer you to our letter of the 24th, and what we verbally communicated some time ago : with respect to an accommodation, we have no objection to grant one to the extent treated of in our last, on your note with satisfactory security, which is in conformity with the custom of this company, and from which we cannot deviate; at the same time we wish you to under-stand, that it is neither meant nor intended *as paying a loss,* which in our opinion is not fully established.   Should you not approve our terms, you will of course have to wait until the documents sent for are received, and when received, if satisfactory to this company, no unnecessary delay will be made in paying the loss.   *Jno. Hollins,* President."

"*Baltimore,* 22d August, 1823.   Messrs. *Thompson & Ba-thurst,*—Gentlemen : Our respective boards of directors have required of us, that the *Spanish* documents, purport-ing to be the proceedings of the Court of Admiralty in *Porto Rico,* respecting the condemnation of the ship *Budget,* be returned to you to be translated into *English,* which we now do, and the sooner it is done, the sooner we shall be enabled to obtain the opinions of our boards, and hand you a copy thereof.   With respect to the log book, as it appears the mate or the sailing master of the *Budget* took it, we expect it will be found and produced, as noticed in our for-mer communications, it being of material consequence to the adjustment of the claim.   Very respectfully, &c.

*Jno. Hollins,* President of the *Maryland* Insurance Co.
*D. Howland,* Pres't of the *Phœnix* Insurance Office."

"4th March, 1824. Office of the *Maryland* Insurance Co. Messrs. *Thompson & Bathurst*,—Gentlemen: The board of directors have instructed me to inform you, that they do not consider the company answerable for the claim you make, for the ship *Budget* and freight insured by policy No. 8881. This opinion they have formed from the advice given by Mr. *Wirt*, and Mr. *Purviance*, who have had the case under consideration. I am also instructed to say to you, that if your note in favor of Messrs. *Robt. and John Oliver*, and by them endorsed, for $4,498.75, with interest and cost of protest, be not taken up and paid at the Bank of *Baltimore*, where it now lays, on or before the 10th inst. it will be handed to Mr. *Purviance*, to be put in suit against you and those gentlemen. We hope you will prevent this unpleasant business, but if not, you well know the blame will not be chargeable to this company. Very respectfully, &c. *Jno. Hollins*, President."

"To the President and Directors of the *Maryland* Insurance Co.—Gentlemen: We have to acknowledge the receipt of your letter of the 4th instant, by which, we are sorry to learn, you still seem determined not to admit your liability for the loss of the ship *Budget*, condemned at *Porto Rico*. We had hoped, that the very clear and decided opinions handed you, of Messrs. *Ogden* and *Binny*, (lawyers considered as the best informed in this country on marine insurance,) would have removed all doubts, and have been conclusive on that subject. It is extremely unpleasant to us, being under the necessity of resisting the payment of our note, which our counsel have advised us to do ; at the same time, we feel confident the result will prove we are in the right, and justifiable in so doing. We remain, gentlemen, with great respect, your obed't serv'ts,

*Baltimore*, 9th March, 1824.    *Thompson & Bathurst*."

The following admissions and agreements, were then read to the jury.

1. It is admitted, that the paper marked C is the order for insurance, submitted by T. and B. to the defendants, when

Vol. V.—22

application was made for this insurance, and is the order upon which the policy was executed. That the defendants may plead the plea of *non infregit conventionem*, short; and under that plea may give in evidence in their defence, any matters which could be presented, by pleading specially any of the following defences, numbered from 1 to 10 inclusive, and may put *in form*, any pleas embracing these particular defences, at any time before the record is made up for the Court of Appeals, if any appeal should be prayed on either side ; and in case such pleas should not be put *in form*, the plea of *non infregit*, with leave as above, shall be understood to cover the following defences; and errors in pleading are, hereby, on both sides released.

*Defence* 1. That the defendants (underwriters) are discharged by the transportation of munitions of war, as set forth in the sentence of condemnation.

2. By the breach of blockade, committed in attempting to enter *La Guira*.

3. By the fact of the destination of the ship, as a member of the *Colombian* squadron, as stated in the record.

4. By the transportation of mariners or soldiers, disguised on the *Role d' Equipage* of the *Budget*, for the service of the *Colombian* government.

5. By the carrying of dispatches from the agents of the *Colombian* government in *London*, to the agents or officers of the government of *Colombia*, in *Colombia*.

6. By concealing circumstances material to the risk.

7. By misrepresentation upon the part of the assured, of facts material to the risk.

8. By a violation of warranty of neutrality, or of a representation of neutrality, made by the assured.

9. By the neglect of the plaintiffs to offer sufficient preliminary proofs.

10. That the plaintiffs can only recover for a partial loss.

II. It is admitted that the *Budget* was, *in fact*, at the time of the effecting of the policy of insurance in this case, and for a long time before, an *American* ship, and always had been so from the time of her being built. That *Hugh*

*Thompson,* of the firm of *Thompson & Bathurst,* was, at the time of effecting this policy, her owner, and that at that time, and for a long time before, her register stood in his name, and so it appears at the Custom House in *Baltimore.* That the said *Thompson* then was, and had been for a long time before, a citizen of the *United States,* resident in *Baltimore.* That *Thompson & Bathurst* were at the time aforesaid, and had been for a long time before, resident merchants, trading and carrying on commerce in *Baltimore.* That Captain *John Meany* was also at that time, and for a long time before, a citizen of the *United States,* resident (when in the *United States*) at *Philadelphia,* and had been for many years in the employ of *Hugh Thompson,* and that at the time of effecting this policy, war existed between *Spain* and the government of *Colombia.*

III. It is admitted that the record marked A, which purports to be a record of the proceedings of the Prize Court at *Porto Rico,* which condemned the *Budget* as hereinafter set forth, was delivered by the plaintiffs to the defendants, upon requisition of the defendants, in the letter of 7th May, 1823, and it is admitted the said record is duly certified.

IV. It is admitted by the defendants, that the paper marked S, purporting to be a decree or sentence of condemnation, made by the Prize Court of *Porto Rico,* is duly certified, and is to be read in evidence in this cause on the trial, and is the paper which was transmitted to the defendants at the time of the abandonment.

V. It is admitted, that the entire cargo of the *Budget,* consisted of munitions of war, and that the brig *New Orleans,* was a *Colombian* ship of war, and that Mr. *Zea,* was the agent of the *Colombian* government.

VI. It is admitted, that at the time this policy of insurance was effected, the *Budget* was in good safety at *London,* and sailed from thence on the voyage insured, and on that voyage, was met off *La Guira* by a *Spanish* privateer, and carried by her into *Porto Rico,* where she was con-

demned, as set forth in the record marked S, referred to in number IV, of this agreement, and that the plaintiffs, on the sixth day of February, 1823, abandoned to the underwriters.

The above agreement is made in both cases, except so much of the second article ·as relates to the ownership, which it is agreed is to be open to controversy on both sides, in both cases.

And the plaintiff then offered in evidence the following sentence: " Sentence—*Puerto Rico*, 23d December, 1822. Seen this summary instruction. Judgment respecting the capture of the corvette *Budget*, coming from *New Orleans*, under the command of captain *John Meany*, on the 1st instant, by the *Spanish* privateer schooner, called *Cora*, or *Beunos Amigos*, armed in this place, under the command of captain *Don Juan Esiga.* Taking into consideration the contents of the navigation documents, and others found on board, with the declarations taken in the act of capture, and those now rendered in this tribunal, the captains, captor, and captured, second mate of the corvette, and prize master, *resulting in the whole*, that this vessel departed from *London*, on the 11th October last, *with a cargo of ammunitions of war*, the property of private individuals, residents of that capitol, who directed the same to *Caracas*, to be delivered to Messrs. *Jones, Powles, Hurry & Co.* with destination for *La Guira*, now a blockaded enemy's *port, in order, that agreeably to Mr. Zea's particular intention, the Colombian navy may be put on a respectable footing,* and that at the same time the brig *New Orleans* be *armed; that a regular deposite of these articles may be established at La Guira, for the general use of the service,* into which port the said corvette endeavored to enter, the said captain having orders, in case he found the same actually blockaded, to proceed with the cargo to *Santa Martha*, a port also occupied by the insurgents, and comprehended in the same declaration, where he was to unload, leaving them for the direction of the mentioned individuals of *Caracas; that the same corvette to be offered for the service of*

*the said squadron, when wanted,* particularly to recommend the same captain *Meany* to be employed in the same marine, with several other remarks contained in the same documents, which manifest the decided protection, the *European, English,* and the *Anglo Americans,* bestow on the insurgents of the continent, against all the rights, and which has been worth consideration in such a short term. His excellency agreed to declare, as in fact he declares, as good prize, the said corvette *Budget,* with the utensils, rigging, cargo, and every other thing she possesses, with regulation, to the last ordinance for privateering, and in the terms prescribed by the royal order, (of the 9th Feb. 1816,) the captured captain, his officers, and crew of the corvette, remaining at the disposal of his excellency, the superior political chief governor of this province, with regulation to the contents of the 58th article of the same ordinance. Thus provided, ordered, and signed by his excellency *Don. Franciscus Marcus Santarda,* honorary magistrate of the most excellent constitutional audience of the territory, and judge de *letras* of this capital, and its districts, which the notary certifies. *Franciscus Marcus Santarda. Jose Maria Leda du Urbina, Royal Notary.*"

Which sentence was enclosed to the underwriters in the letter of abandonment of the 6th of February, 1823; and was delivered to the defendants on the day on which it bears date. The defendants then produced *Thomas Parker* and *David Winchester,* who proved that it was the usage of underwriters to call for the production of the log book, as part of the preliminary proof, in all cases where it was considered necessary to satisfy the underwriters with regard to the claim of the assured, and that they knew of no instance, in which such a call had not been complied with, and that they would consider the underwriters as justified in refusing to pay a loss, in a case where the production of the log book had been demanded and refused, or its non-production not accounted for. And also proved, that the protest, and proof of interest according to

the usage of the insurance offices in *Baltimore,* are the only usual preliminary proofs, and that the log book is never produced unless when called for.   Whereupon the defendants, by their counsel moved the court, that the plaintiffs had not offered the necessary preliminary proofs to enable them to maintain this action; but the court (ARCHER, Ch. J.) was of opinion, that the proofs offered were sufficient, the defendants having waived all objection to their sufficiency, by their letter of the 4th March, 1824, herein before set forth.   The defendants excepted.

2. The defendants, to support the issue on their part, offered in evidence the copy of the record of the Prize Court of *Porto Rico,* which it is admitted, is duly certified and authenticated, and is the same paper delivered to the defendants by the plaintiff, in pursuance to the letter of the 24th May, 1823, from defendants to plaintiffs, and of their answer of the 26th May, 1823, for the purpose of showing that the original papers of which copies and translations purport to be inserted in said record, were on board the said ship *Budget,* at the time of her capture, and were acknowledged to have been so on board by the said *Meany,* the captain of said ship, in his examination upon oath, before the said Prize Court.   To the admissibility of which record for the said purposes, the said plaintiff by his counsel objected, and the court sustained said objection, and refused to permit said record to be read in evidence to the jury for said purpose.   The defendants excepted.

3. In addition to the matters offered in evidence by the plaintiff, which are stated in the defendants' first bill of exception, and hereby made a part of this exceptions, the plaintiff further to support the issue on his part, offered to swear *John D. Danels* as a witness to prove that the blockade mentioned in said sentence, as one of the grounds of condemnation, did not at the period of time therein referred to, exist in point of fact.   To the admissibility of which evidence the defendants by their counsel objected, because the said sentence of condemnation, had been offered and re-

lied on by the plaintiff as evidence in support of the issue on his part, as stated in the defendants' first exception. But the court overruled the said objection and permitted the witness to depose to the said fact. The defendants excepted.

4. The defendants, in addition to all the matters stated in the foregoing exceptions, and which are hereby made a part of this exception, offered in evidence the following letter, which it is admitted was written by *Thompson & Bathurst,* and received by *John Meany,* the captain of the said ship *Budget.* "*Baltimore,* Nov. 27th, 1821. Captain *John Meany,* supercargo of the ship *Budget:* Dear Sir—On the arrival of the ship *Budget* at *New Orleans,* we leave to your good judgment to freight, or charter her in such manner as you may consider will be most advantageous for the concerned. Wishing you a pleasant and prosperous voyage, we remain your obd't h'ble servants. *Thompson & Bathurst.*"

And also offered in evidence the following letter from *Hugh Thompson* to said *Meany,* which it is admitted was written by said *Thompson,* and received by said *Meany.*

"*New Orleans,* April 29th, 1822. Mr. *John Meany:* Sir—You will proceed in the ship *Budget* for *London,* and there deliver the goods on freight. Dispose of the staves to best advantage, and employ the ship either by freighting or any other way you think will be to our interest. If you should go to *Bordeaux,* call on our friends there, who will assist you in getting a freight to the *United States.* Write by every opportunity. If your captain does not suit, you are at liberty to discharge him. Wishing you a pleasant and prosperous voyage, I remain your obd't humble ser'vt. For *Thompson & Bathurst. Hugh Thompson.*"

And also gave in evidence by the testimony of several witnesses, who had been for many years engaged in underwriting, that in *their judgment,* the non-disclosure of the fact, that the vessel on which insurance is asked, is *to be entirely* laden with articles contraband of war on the voy-

age insured, would in the general opinion and judgment of underwriters, influence their judgment, and induce them to demand a lower premium, than if such fact was communicated. And the defendants further gave in evidence, that if at the time the said order was given, and policy effected, it had been known that the said ship would be *entirely* laden with munitions of war, to be used for the service of the *Colombian* government at *La Guira*, partly to arm a vessel of war called the *New Orleans*, belonging to the said government, and in part to establish a depot of arms at *La-Guira* for the service of said government; that the said ship *Budget* was to be offered for sale to the said *Colombian* government, whenever she might be wanted, and that the said *Meany* was to be employed in the naval service of said government, that the knowledge of said facts, or either of them, in the general opinion and judgment of underwriters, would have induced the defendants to decline said risk altogether, or to charge a much higher premium, than that for which said insurance was effected; and the defendants further proved by the testimony of *Baptist Mezick*, that the said ship *Budget* was, when built, pierced for guns, and was readily convertible into an armed ship. And the plaintiff, further to support the issue on his part, read in evidence to the jury the order for insurance, with the endorsement thereon, which it is admitted were presented by *Thompson & Bathurst* to the *Maryland* Insurance Company, on the days of their respective dates, and that insurance was thereupon effected by the said company, for the premium stated at the foot of the first of said orders, as inserted in defendants' first exception.

And the defendants proved by *Henry Thompson*, a witness sworn in the cause, that he was a director in the *Baltimore* Insurance Office, on the 9th October, 1822, when an order, precisely in the same terms to that first laid before the *Maryland* Insurance Office, was presented to the *Baltimore* office; that after the adjournment of the board on that day, the witness met the said *Bathurst*, one of the

firm of *Thompson & Bathurst*, and told him from his knowledge of *Captain Meany*, he thought it probable there would be contraband on board the said ship on said voyage, and that by the order of insurance presented to the said *Baltimore* office, the said *Thompson & Bathurst* would not in that case be covered, and that thereupon the said *Thompson & Bathurst*, on the succeeding day, presented the explanatory order endorsed on the said first order; and also offered evidence to prove, that according to the usage and practice of underwriting in *Baltimore*, when it is intended the policy shall cover contraband, that fact is always stated by the party offering for insurance.

And thereupon the *plaintiff* offered in evidence to the jury, the following letters and endorsements:

" *London*, September 3d, 1822. Messrs. *Thompson & Bathurst:* Gentlemen—I wrote you stating that I was disappointed in not getting the freight I expected to *Philadelphia*, and waiting for that freight prevented my going to *Bordeaux*, where a freight was ready for me; in the mean time, I had an application from *Hamburg*, to go there, and load for *Vera Cruz*. The agent and myself agreed on £1800 sterling. I waited a reasonable time, and not receiving an answer, I chartered the ship to go from this port, *or from Antwerp*, to one of the following ports in the *Colombian* government,—" *La Guira, Porto Cabello, Santa Martha* or *Carthagena*, and to receive £1050 sterling, and *they* pay all the port charges. We commence loading this day, and will despatch immediately. The ship is now in complete order. I will take the command : the captain I discharged, he being indolent, and bad habits, which endanger our lives. I have had only two men on pay during our stay in this place. From *La Guira*, or port of discharge, I intend going to a port in the *United States—Norfolk*, or *Baltimore*, will have a preference. I am now making arrangements to place to your credit £200 sterling, which, with the premium, you will place to the credit of ship *Budget.* I would recommend your making insurance on said ship, at, and from

VOL. V.—23

either *London* or *Antwerp*, to one of the following ports : *La Guira*, *Porto Cabello*, *Santa Martha*, or *Carthagena*, and from the port of discharge to the *United States, Norfolk* and *Baltimore* will have a preference. The *Budget* stands A, No. 1 at *Lloyds :* she has been docked, caulked all over, coppered with 24 oz. copper. She has two suits of sails, one almost new ; 4 anchors, and 4 cables, two of the cables chain. She has been put in the completest order in rigging—and in short, in every thing to make her complete. I will ship this day a mate well acquainted with that coast. Under all those circumstances, no doubt you will have the insurance done reasonable. Mr. *Henry Thompson* is well acquainted with the ship, and I suppose, in the office he is in as director, she would be done the most reasonable. Some freight may offer in *La Guira*, that would prevent my returning to the *United States*. In that case there should be a return premium—there is not much prospect of such a thing taking place. There is little doubt but we will sail from this port direct to *La Guira*. *John Meany*." Endorsed, Rec'd 9th October, 1822.

"*London*, September 4, 1822. Messrs. *Thompson & Bathurst*,—I wrote to you yesterday by this opportunity, stating the particulars relating to the ship *Budget*, and her destination to *La Guira*, from *London*, or from *Antwerp*. If she should go to *Antwerp*, which is not probable, I will get the insurance done here, so that you will make the insurance from either of the ports, say $8000 on ship, and $2000 on freight. Yours truly, *John Meany*."

And also proved they were in the hand writing of said *Meany*, and that they were received at the time endorsed upon them, but which said letters were never communicated to the defendants before the policy in question was executed, except so far as they are contained in the extracts accompanying the order herein before mentioned ; and also proved, that the printed forms of policies, in all cases made by defendants, contained the following warranty, to wit: "Warranted by the insured free from any charge, damage

or loss, which may arise in consequence of seizure or detention of the property, for, or on account of any illicit or prohibited trade." And also gave in evidence to the jury, by *Henry Thompson*, a merchant of *Baltimore*, that at the time this policy was effected, there was not sufficient trade between *London* and *La Guira*, to employ a vessel of the size of the *Budget*, except a part of the cargo consisted in articles contraband of war; and the said *Henry Thompson*, in giving the reasons for his opinions, why he supposed that the order for insurance, as originally presented to the *Baltimore* office, of which he was a director, was intended to embrace contraband of war, stated, that he believed a full cargo for a vessel of the size of the *Budget*, could not be obtained to be carried, or brought from *London* to *La Guira*, without containing a considerable portion of contraband articles. And also gave in evidence to the jury, by the testimony of several underwriters of great experience, that in their judgment the disclosure or non-disclosure of the fact, that the vessel on which insurance is asked, is to be laden entirely of contraband of war, on the voyage insured, would be wholly immaterial, and would not increase or diminish the premium asked, where the order requests to be insured against contraband, or against all risks. That *General Morales*, commander in chief of the royal forces of *Spain*, in that part of the government of *Colombia* where the ports of *La Guira*, *Porto Cabello*, *St. Martha*, and *Carthagena* are situated, published about September, 1822, a declaration that the said ports were in a state of blockade, and which was circulated in the *American* newspapers, and that there was a general impression and belief, among the merchants in this country, that the said blockade was not maintained by any adequate force, and that the same amounted only to what is usually denominated a paper blockade; and that although they, the *Royalist Spaniards*, did not maintain such blockade by any actual force, yet that the *Spanish privateers* captured all vessels they fell in with, going to or from those places,

and the prize courts of *Porto Rico*, a *Spanish* island, con-demned them, whether they had contraband on board or not, and that premiums of insurance were charged by the underwriters accordingly; and also proved that *La Guira* was one of the places included in such paper blockade; and also proved, that the ship *Budget* was built for, and used as a merchantman, and not peculiarly fitted for a ves-sel of war; and also proved, that she was a fast sailer, and that the premium of insurance on her, for the whole voy-age described in the policy, if the sea risks only had been intented to be covered, would not have exceeded four per cent: and also offered in evidence, that the vessels loaded with the munitions of war, and the munitions themselves, from the *United States* to *La Guira*, and with liberty of another port on *Spanish Main*, and back to the *United States*, were insured on the whole voyage round at six per cent,—and that the risk from the *United States* to these places, was as great, if not greater, than from *London* to these places.   And *the defendants*, for the purpose of showing that vessels laden in part with contraband, and destined to ports in *Colombia*, or other ports in *Spanish America*, were, when met with by *Spanish* vessels of war, and privateers, suffered to proceed after taking out the con-traband, with the rest of their cargoes being innocent, offered as a witness to the jury, *Thomas Parker*, Presi-dent of the *Universal* Insurance Company, who testified that in May, 1823, the schooner *Hunter*, *Captain Hull*, bound from *Baltimore* to *St. Martha*, *Carthagena*, and other places on the *Main*, partially laden with contraband, was captured by a *Spanish* privateer, and taken into *Hava-na*, where prize proceedings having been instituted, the contraband articles were condemned, and the residue of the cargo with said schooner released.   And also offered as a witness *Richard H. Douglass*, who proved that the brig *Morris*, *Captain Bodily*, bound from *Baltimore* to *Vera Cruz*, having on board a number of muskets and flints, with other cargo being innocent, on her arrival in

the latter part of April, in the year 1823, was permitted to trade with the town of *Vera Cruz,* then in possession of the *Patriots,* on payment of duties to the *Royalist Span-iards,* occupying the castle of *St. John D'Ulloa,* which commanded the entrance of *Vera Cruz,*—that after some time, the said muskets and flints were discovered by the *Royalist Spaniards,* who seized and confiscated the same, but did not interfere with the rest of the said cargo or ves-sel.   And also offered as a witness *Frederick C. Graff,* who proved that the schooner *Harriet, Captain Baker,* sailed from *Baltimore,* in March, 1822, with a cargo con-sisting in part of contraband, bound to *Santa Martha,* and *Carthagena,* both of which places she visited, and sold that part of the cargo not contraband, at *Carthagena,* and then with the proceeds of said sales in money, and the contra-band articles, sailed for *Chagres,* and off the port of *Car-thagena* was captured by a *Spanish* privateer, who took from her the money and contraband articles, and released the schooner, paying the captain his freight.   That after-wards, the navy department ordered captain *Biddle,* of the *United States ship Congress,* to call at *St. Jago,* where the said privateer was owned, and interpose a claim for the said money so illegally taken by said privateer.   And further offered evidence, that the general impression of merchants and underwriters in *Baltimore,* at the period when this in-surance was made, was, that vessels sailing from the *Uni-ted States* to ports in *Colombia,* and other ports in *South America,* with cargoes not contraband in whole, or in part, would be permitted to pass and proceed to their respective places of destination without interference, or capture by *Spanish* privateers.

And thereupon the *plaintiffs* offered evidence to show, that the general impression of merchants and underwriters in *Baltimore* was, that vessels sailing from the *United States* to ports in *Colombia,* and other ports in *South America,* with any kind of cargoes, whether contraband or not, were after the proclamation of *Morales* relative to the blockade,

as hereinbefore referred to, captured by *Spanish* privateers, and condemned in the *Spanish* tribunals.    And also offered in evidence by *John D. Danels,* that the port of *La Guira,* from the 1st of October, 1822, to the 1st day of January, 1823, was never blockaded in fact, and that during that period the *Colombian* squadron had a decided ascendancy in that neighborhood.    And the defendants gave in evidence that the said ship *Budget* was not a remarkably fast sailer, and that the rates of premiums on vessels, proceeding from ports in the *United States,* to ports in the government of *Colombia,* with cargoes of contraband, were from six to seven and a half per cent., but that the vessels so insured were remarkably fast sailing vessels, and were of a class generally named clippers, and built expressly for the purpose of such voyages.    And they further gave in evidence that the risk of a contraband cargo carried in such a ship as the *Budget,* from *London* to the ports of *La Guira* and *Porto Cabello,* would be much greater than in these fast sailing *American* vessels, going from ports in the *United States* in similar cases, to the said last mentioned ports. And the defendants further gave in evidence, by several underwriters of great experience, that underwriters, in calculating their premiums *on* orders of insurance, do not estimate the risk as the worst possible which can arise under such order, and charge accordingly.

And thereupon *the defendants,* by their counsel prayed the court to instruct the jury—

1. That the terms of the order for insurance, and of the policy in this case, amount to a warranty that the ship *Budget* was a neutral ship, bound upon a mercantile voyage, with a permission to carry some articles contraband of war, but in every other respect to be employed and navigated as a neutral ship; and if the jury find, from all the evidence and admissions in the cause, that the ship *Budget,* on the voyage insured, was entirely laden with munitions of war, and that the same were destined for the service of the *Colombian* government at *La Guira,* partly to arm a vessel of

war called the *New Orleans*, belonging to the said government, and in part to establish a depot of arms at *La Guira*, for the service of the said government; or that the said ship was to be offered for sale to the *Colombian* government, whenever she might be wanted; or that the said *Meany*, captain of the *Budget*, was to be employed in the naval service of the said government; or that a breach of blockade was committed by the *Budget*, as set forth in the sentence of condemnation of the Prize Court of *Porto Rico;* that then the policy is violated, and the plaintiff is not entitled to recover.

2. That the terms of the said order for insurance amount to a representation, that the *Budget* was a neutral ship, bound upon a mercantile voyage, with permission to carry some articles of contraband of war, but in every other respect *to* be employed and navigated as a neutral ship; and if they believe from all the evidence and admissions in the case, that the ship *Budget*, on the voyage insured, was entirely laden with munitions of war, and that the same were destined for the service of the *Colombian* government, at *La Guira*, partly to arm a vessel of war called the *New Orleans*, belonging to the said government, and in part *to* establish a depot of arms at *La Guira*, for the service of the said government; or that the said ship *Budget* was to be offered for sale to the *Colombian* government, whenever she might be wanted ; or that the said *Meany*, captain of the *Budget*, was to be employed in the naval service of said government ; or that a breach of the blockade was committed, as set forth in the sentence of condemnation, that then the policy is discharged, and the plaintiff is not entitled to recover.

3. If the jury believe, that the *Budget*, at the time of presenting the said order for insurance, and at the execution of the policy, was in fact an *American* vessel, owned by *Hugh Thompson*, an American citizen, and a merchant resident in the city of *Baltimore*, that the assured were bound so to employ and navigate the said ship, as not to

compromit her neutral character and rights, except so far as they might be compromitted by the transportation of some articles contraband of war, for commercial purposes ; and if the jury find, from all the evidence and admissions in the cause, that the said ship *Budget*, on the voyage insured, was entirely laden with munitions of war, and that the same were destined for the service of the *Colombian* government at *La Guira*, partly to arm a vessel of war called the *New Orleans*, belonging to the said government, and in part to establish a depot of arms at *La Guira*, for the service of the said government; or that the said ship was to be offered for sale to the *Colombian* government whenever she might be wanted ; or that the said *Meany*, captain of the said *Budget*, was to be employed in the naval service of the said government; or that a breach of blockade was committed by said *Budget*, and that the existence of such facts, or either of them, became the efficient cause of the condemnation of the ship, and were produced by the act of the assured or their agent, that then the policy is discharged, and the plaintiff is not entitled to recover.

4. If the jury believe, that the ship *Budget* was, at the time of the execution of this policy of insurance, a neutral ship in fact, that it was incumbent on the assured so to employ and navigate the ship, as not to compromit her neutral character and rights, except in the transportation of some articles contraband of war, for commercial purposes ; and if the jury find, from all the evidence and admissions in the cause, that the said ship, on the voyage insured, was entirely laden with munitions of war, and that the same were destined for the service of the *Colombian* government at *La Guira*, partly to arm a vessel of war called the *New Orleans*, belonging to the said government, and in part to establish a depot of arms at *La Guira*, for the service of said government; or that the said ship *Budget* was to be offered for sale to the *Colombian* government whenever she might be wanted; or that the said *Meany*, captain of the *Budget*, was to be employed in the naval service of said

government, and the existence of such facts, or either of them, became the efficient cause of the condemnation of the ship, and were produced by the assured or their agent, subsequent to the execution of the policy, that then the policy is discharged, and the plaintiff is not entitled to recover.

5. If the jury believe, from all the evidence, that a breach of the blockade was committed by the *Budget*, as set forth in the sentence of condemnation; and that the ship, upon which this insurance was obtained, was an *American* ship, that then the policy is discharged, in as much as a contract of insurance, the object of which was to protect the assured from a loss arising by a breach of blockade, would be void in law.

6. That even if a contract of insurance against a loss from breach of blockade would be valid in law, the assumption of such a risk must arise from an express undertaking on the part of the underwriters, and as there is an entire absence of any such express undertaking in this case, the plaintiff is not entitled to recover, if the jury should be of opinion that a breach of blockade was committed by the *Budget*, as set forth in the decree of condemnation.

7. That the order for insurance in this cause, contains no communication or disclosure of the facts, that the ship *Budget* was, on the voyage insured, to be fully and entirely laden with munitions of war, or that the same were destined for the use of the *Colombian* government, or that the said ship *Budget*, with the said *Meany* as the captain, were to be employed in the service of the *Colombian* navy; that in the absence of all evidence, that the said facts, or either of them, were disclosed to the defendants, at the time the insurance was effected,—if the jury believe that the said facts, or either of them existed—and if they further believe that the said *Meany* was the agent of the plaintiff in chartering the said ship *Budget*, and had the general management and conduct of the employment of the said ship, and that the said *Meany*, at the time this order was presented

for insurance, and after policy effected, had knowledge of the facts before mentioned, or either of them; and if the jury should further believe, that the facts or either of them, if communicated to the defendants, would have influenced their judgment in forming an estimate of the risk, and have induced them to decline it altogether, or demand a higher premium than what was taken for effecting the policy in this cause, that then the plaintiff is not entitled to recover.

8. That the order for insurance in this cause, contains no communication or disclosure of the facts, that the ship *Budget*, on the voyage insured, was to be fully and entirely laden with munitions of war, or that the same were destined for the use of the *Colombian* government, or that the ship *Budget*, with the said *Meany* as her captain, was to be employed in the service of the *Colombian* navy; that in the absence of all evidence that the said facts, or either of them, were disclosed to the defendants at the time the insurance was effected, if the jury believe that the facts, or either of them existed; and if they further believe that the said *Meany* was the agent of the plaintiff in chartering the ship *Budget*, and had the general management, and conduct in the employment of the said ship, and that at the time when he wrote his letters to the plaintiff, under the date of the 3d and 4th of September, 1822, (extracts from which were communicated to the defendants in their order for insurance,) he had knowledge of the facts before mentioned, or either of them; and if the jury should further believe that the said facts, or either of them, if communicated to the defendants, would have influenced their judgment in forming an estimate of the risk, and have induced them to decline it altogether, or to demand a higher premium than was taken for effecting the policy in this cause, that then the plaintiff is not entitled to recover.

9. If the jury believe, from all the evidence and admissions in the cause, that the ship *Budget*, on the voyage insured, was entirely laden with munitions of war, and that the same were destined for the service of the *Colombian*

government at *La Guira*, partly to arm a vessel of war called the *New Orleans*, belonging to the said government, and in part to establish a depot of arms at *La Guira* for the service of the said government; or that the ship *Budget* was to be offered to the *Colombian* government, whenever she might be wanted; or that the said *Meany*, the captain of the *Budget*, was to be employed in the naval service of the said government; and that such acts or either of them were calculated to produce the condemnation of the ship, upon the event of capture, according to the habits, and common practice of the belligerent in question, that then the policy is avoided upon the principles asserted in the previous prayers, although such acts might not legally authorize a condemnation upon the principles of the law of nations. Which instructions, and each of them, the court refused to give. The defendants excepted.

Upon these prayers ARCHER, Ch. J. delivered the following opinion.

Many very important principles of insurance necessarily arise in this case, and have been very ably and learnedly discussed.

The first question to which our attention will be directed, will be the existence or non-existence of a warranty of neutrality, or of a representation of neutrality.

The order for insurance containing the alleged representation, being referred to in the policy, and by such reference, constituting a part of the policy, whatever obligation it may create, would be considered rather in the light of an express warranty, which would require a strict performance than of a mere representation, which would only demand a substantial compliance with its terms.

It is conceded, that there exists in the order, no direct warranty of neutrality, but it is contended, that if one arises by necessary implication from the words used, an express warranty is created. We admit this doctrine, and shall examine the order to ascertain whether these inferences contended for, are necessarily deducible from it.

This order demands an insurance against *all risks*, and then merely speaks *of a possible danger of contraband.* The amount of it then, is only this, "I apprehend danger from the peculiar voyage, guard me against every possible risk. I am ignorant of the hazard I run, for my advices are silent on the subject; my fear is, of the possibility of contraband, but you know the nature and course of the trade; as you are to cover all risks, secure yourself by an adequate premium." There is no assertion that contraband would be on board, the possibility only is asserted. If a vessel be stated to be *American*, there is in general, a warranty that she is *American*, and all the just inferences, and legal consequences which are deducible from such an assertion, flow necessarily; she must be navigated, and documented, as the laws of her nation demand. So, to say, that she sails with a sea letter is a warranty. But it must be observed, that in both these cases there is *the positive averment of a fact.* In this case, there is no such positive averment. That which is stated, is stated *dubiously.* She may *possibly carry contraband,* but whether she will or not, the assured's advices are silent, or in other words, the they are ignorant of the fact. Can it then be seriously contended, that they meant to warrant as a fact, that which they apprize the office, they know nothing about? Where is the case to be found which decides that the assertion, *she may possibly be an American,* she *may possibly carry a sea letter,* amounts to a warranty? None such have been cited, none such exist; to infer a warranty from such a statement, would be to make a contract for the assured, where they never intended to make one for themselves. The ship being in fact an *American,* and the owners residents and citizens of this place, can make no possible difference, because her national character is not pointed to in the policy by any express designation, and the policy is "*for whom it may concern.*" That is, it is for the plaintiffs, if they are then the owners, or any body else, neutral or belligerent, who might then be the owner, and for whom the

plaintiffs may have been the agents. The expression, " *to be paid to them in case of a loss*," amounts to nothing against this view. For it might have amounted to a mere direction to the office to pay them in the character of agents, if in fact, such agency had existed, in order that in such a case, they might be the more effectually indemnified in the event of loss, for the advance, not only of this premium, but of the balance of other premiums, which may have been advanced as a general agent for effecting insurances, for which advance and balance they would have had an unquestionable lien, as against their principal upon the policy itself. But if these words are interpreted to mean, that the insurance was, at all events, effected for them and them only; *then the words "for whom it concerns"* are contradicted, or they must be treated as if they constituted no part of the stipulation. The rule of interpretation, as we have always understood it to be, is, that you must so construe an instrument, that every word, if possible, shall have its appropriate meaning, and this we do in this instance, without violating or discarding any portion of the instrument. In aid of this view of the clause referred to, we cannot fail to remark the *commercial understanding* of the word contraband, as proved by one of the witnesses, that it was considered rather as having a reference to the kind, and description of the cargo, than the national character of its owner, or of the peaceful or belligerent relation of his government towards other powers. There is then no warranty of neutrality, and considering the representation as incorporated in the policy, and constituting a part of it, there exists of course no representation of neutrality.

This leads us to the inquiry of the extent of the risk covered by this policy. The words of the policy look *per se*, to a promise of indemnity for all losses except those proceeding from illicit or prohibited trade ; it covers the risks of neutral ownership, and of belligerent ownership. We mean the ordinary risks of such an ownership, for perhaps there may be some belligerent risks, so extremely ha-

zardous, imminent and extraordinary, as that they could not be presumed to have entered into the contemplation of the parties, and where of course concealment might be held to vitiate the policy. But in the absence of such uncommon peculiar perils, the assurer shall, in the general phraseology he has used, be presumed to have contemplated the possibility of the greatest risk, and if they have not done so by demanding a premium commensurate with their contract, it is their own fault, and they shall not in a court of justice be permitted to seek shelter under their own neglect, from the fulfilment of their express stipulation. And here we may be permitted to say, that the interpretation of this instrument is a question for our consideration exclusively. The same rules apply to a policy, as to all other instruments. It must be expounded by principles of law, and not by the opinions of witnesses. It is true, that where the usage of trade has assigned meaning to particular words, the courts will resort to such usage to assist them in the interpretation, and to enable them to effectuate the intention of the parties. But the assured cannot escape from a legal responsibility, change, modify or alter it, by seeking refuge in the varying opinions of commercial men, when they expressly say, they assume all risks, and no warranty exists that will justify us in limiting their responsibility. Had *Thompson and Bathurst*, instead of acting for themselves, been agents of the subjects of a belligerent nation, there can be no doubt that the policy covered such belligerent property, and the ordinary risks to which it would have been subjected. It was true she was registered as an *American* ship, but the assurer had no right to look at this without a warranty or representation, for they might before the date of such policy have sold her to such belligerent, or had they been in treaty by their agent in *London* for the sale of this vessel to a belligerent, for whom they had orders in case of a purchase to insure, and *Thompson & Bathurst* not in fact knowing whether, at the date of the order for insurance, a sale had been effected or not, and acting in

pursuance of their agency to cover belligerent ownership, if such should be the fact, or if not, to secure themselves, could there exist a doubt but that the policy would have covered either the belligerent owner, in case of a sale to him, or *Thompson & Bathurst,* if they had not in fact parted with their property?

The doctrine, that in such a policy the risk of belligerent ownership is undertaken, is settled in the Supreme Court of the *United States. Hodgson vs. Mar. Ins. Co. of Alexandria,* 5 *Cranch,* 100. And it is conceded, that the *New York* decisions have pronounced the assumption of belligerent risks. Nor do we perceive that any of the *English* decisions contradict in this doctrine; certainly those which have been cited by no means impugn it. It is not our intention minutely to analyze all the authorities cited, but it may be briefly remarked, that the following principles are deducible from the cases of *Christie vs. Secretan,* 8 *T. R.* 192. *Dawson vs. Atty,* 7 *East.* 367, as explained by *Lord Ellenborough,* in *Bell vs. Carstairs,* 14 *East.* 374. *Horneyer vs. Lushington,* 15 *East.* 46. *Oswell vs. Vigne,* 15 *East.* 74. 1. That although all risks are assured, neutral as well as belligerent, yet the vessel insured must not induce her condemnation, by the absence of documents necessary to attest her national character. 2. That the insurance operates upon the ship whether neutral or belligerent, as she may happen to be at the time of insurance. 3. That a general insurance covers all losses from the perils insured against operating *adversely,* and not *through the medium of any act or neglect* on the part of the assured himself, or his agent, producing the loss of the property insured. 4. That for a loss of which the owner or his agent may be the efficient cause, proceeding from his act or neglect, and which in the captain will not amount to barratry; the owner is his own insurer, *and* his loss thus occasioned is not covered by the policy.

Are not these doctrines reasonable and just? What is more reasonable than to say, that although the contract is

silent on the subject, it should be construed as having re-
ference to, and operating upon the character and condition
of the ship, as it existed in fact at the time the policy was
effected? All contracts with regard to property, are un-
doubtedly made in reference to it, as it exists at the time of
the contract, and any change in it, altering its character or
its quality, would be a breach of good faith.   This princi-
ple, as it is founded in the soundest morality, will be
found to pervade every branch of the law as connected
with the doctrine of contracts.   If the vessel be neutral, it
would be then only in accordance with this universal and
obvious principle, to say either, that such her character as
it existed in fact, should be maintained, or if forfeited by
the act of the assured, he should not make such act the ba-
sis of a claim against the insurer.   But it may be said, that the
highest risk of a belligerent capture is assumed, and so no
injury would be done to the insurer.   To this however, it
may be replied, that this is the chance the insurer takes,
that the vessel may in fact be neutral, and if so, he is enti-
tled to all the lessened responsibility growing out of such
character.   We do not mean to say, as seems to be intima-
ted in the *Massachusetts* case, that it enters into the con-
tract, that if the vessel be neutral, the neutral character
shall be maintained; but the doctrine grows out of the
soundest principles of equity and justice, as applicable to
the state of the thing about which the contract is made, at
the time when it is made, not as springing from any stipu-
lations of the contract directly enforcing and coercing their
observance, but as having their foundation in that sense of
honesty and good faith, which the law declares shall regu-
late all the social transactions of man, which are the objects
of its cognizance.   With what pretence of equity or jus-
tice could the assured call upon the underwriter for in-
demnity, when his own default, or that of his agents, had
occasioned the loss of the subject insured?   We do not
speak of such conduct on the part of the captain as may be
barratrous, for that is expressly assumed, but of the other

acts and defaults of the captain not amounting to barratry.) The most labored train of reasoning could not make the proposition clearer, than the statement of the interrogatory itself, which must receive its response in that sense of justice, inherent in the breasts of all mankind. A policy against all risks will not cover the frauds of the owner, *Groix vs. Knox,* 1 *John. Ca.* 340; nor his misconduct, nor his voluntary acts inducing loss; for it is impossible to presume that these risks entered into the contemplation of the parties, and if they did, would it not be manifestly against the policy of the law to support them? Mr. *Philips* condemns the validity of a policy bottomed upon such principles, and subjects to the same fate, an insurance against the party's own negligence, as it would place one man completely in the power of another, and would be injurious to the parties, and to the community of which the assured and insurer were members. Mr. *Justice Kent* says, in the case above referred to, that " insurers are not liable for losses arising from even *the mistakes* of the owner or captain." And why should they be? The captain and mariners are the agents of the owner in the navigation of the ship, and in virtue of the existence of such agency, he is answerable for their conduct in this respect, and is his own insurer for losses proceeding from such conduct. This doctrine is not confined, as has been contended, to such acts as leave the ship without the necessary documents, to attest her national, or neutral character, but *to other acts,* inducing a loss. If a vessel be partly laden with powder, and she is blown up by the negligence of one of the mariners, the underwriters are not answerable. So it has been held, that if a captain of a neutral vessel resist a search, when it is rightfully demanded by belligerents, or attempt to rescue a vessel sent in by a belligerent captor, the loss cannot be recovered of the underwriter. So in the cases of *Horneyer and Lushington, and Oswell and Vigne,* the having on board simulated papers was the act of the captain, not affecting the character of the ship ; for that was admitted, in

the sentence of condemnation, to be *Russian* in the one case, and *Swedish* in the other. In short, in all policies, general or special, the assured always undertake for the faults and negligence of their own captain, or for his unskilfulness, and he cannot be heard to ask in a court of justice for indemnity for losses proceeding from such causes, the risk of which the underwriters never undertook.

We cannot accede to the doctrine, that the cases in *East*, proceeded upon the ground of the unseaworthiness of the vessel. It is a conclusive answer to this argument, to say, that had this been the foundation of their judgment, the decision in *Dawson & Atty*, would have been different from what it was. For if the absence of a ship's necessary document made her unseaworthy, the owner of the goods insured could not in that case have recovered. For his contract would have been infected by the condition of the ship, although he were not owner.—Being unseaworthy the policy would have been discharged. Besides, if these various cases could have been put upon this ground, it is inconcievable that *Ld. Ellenborough* should have so labored to place them upon other grounds. Had the implied warranty of seaworthiness any thing to do with the determination in *Bell and Carstairs*, the possession of all documents to show national character, would have been held, to be necessary at the commencement of the voyage; this implied warranty always operating at that moment; yet his lordship declares, that the possession of such documents are only necessary in case of capture, or when their production becomes material; the want of them at any other time, or for any other purpose, is immaterial, and the want of them is immaterial even in the case of capture and condemnation, unless the absence of such paper is the efficient cause of condemnation. We may in fine, observe, that we discover in these cases, the development of no new or extraordinary doctrines, but the application of the first, elementary and best established principles of the law of insurance to the cases then before the court.

We shall now consider the vessel in two lights. 1. Either as a belligerent transport, or, if not in that character, as having a death wound inflicted on her neutrality, by the trade in which she had embarked *before the policy began to operate.*

2. As a neutral vessel insured against all risks which underwriters in a general policy assume, except prohibited trade; but that the acts complained of as changing her character into a belligerent, took place after the policy began to operate, and that the condemnation proceeded upon that ground.

Taking either view, it will be found, as we conceive, that the cause of condemnation is covered by the terms of the policy, and the risks assumed.

In the consideration of the first question, we shall not stop to inquire, whether she were in fact a belligerent vessel, and had lost her neutral character, at the date of the policy, but shall assume the truth of the proposition for the sake of this inquiry. It may, however, be observed, that the policy began to operate but the very day before her departure from *London,* and whatever hostile footsteps, if any, were impressed upon her, were made before the date of her policy. The charter party had been made nearly a month before her cargo was on board ; and it is fair to presume, that all documents and papers which were found on board at the time of the capture, were with her when the policy began to operate. The fact of her neutral ownership, and her being documented as a neutral, could not affect the question ; for if she were, in fact, in the service of one of the hostile powers, all the world, notwithstanding her ownership and documents, would have considered and treated her as a belligerent vessel.

Assuming then the truth of the proposition, that she was a belligerent vessel at the date of the policy, let us recur to some of the results which we have endeavored to establish. We have seen,

1. That a general policy covers belligerent risks.

2. That the policy operates upon the character of the ship at the time of insurance, and as a corollary from this, 3dly. That a change effected in the character of the object insured, and operating as the efficient cause of condemnation, must be made after the inception of the contract of insurance, to have the effect of discharging it.

If we have succeeded in maintaining these positions, the conclusion inevitably follows, that the vessel being belligerent when the policy was effected, it operated upon its character as it then existed, and if her hostile attitude and character be construed to be the ground of condemnation, then the loss is within the policy.

The second general inquiry we propose making, assumes the fact, that this vessel was neutral when the policy was effected. She is admitted to be neutral, and to have been documented as an *American* ship, but, independent of these admissions, it assumes the further fact, that the acts complained of, as effecting a change in her from a neutral to a belligerent, were done after the date of the policy, and this presents three inquiries for consideration.

1. Was such change, if any, produced by the act or default of the captain or owner.

2. Was such act or default the efficient cause of condemnation, and

3. Was such cause of condemnation uncovered by the policy.

Having regard to the above assumption, and supposing that the acts done converted her into a belligerent; if these inquiries are answered in the affirmative, then the policy is discharged, if there be any truth in the reasoning and views taken by us in the former part of this opinion.

It appears that the cargo belonged to residents of *London*, and was consigned to a commercial house in *Caracas*, with an ultimate destination for the *Colombian* service. It is by no means certain from the sentence, whether Capt. *Meany* knew of the ultimate destination of this cargo. It is not believed, that any of the ship's papers, if made in the ordina-

ry form, would show more than the character of the goods, and the name of the consignees. But the destination of the cargo, in all probability, was fixed and ascertained by the shipper's letters of advice to the consignees, or by the communications of Mr. *Zea*, if there were any on board, or if there were not, his intentions with regard to this property might have been intimated in the shipper's letters to the consignees, or if not there ascertained, was found to exist in other documents or communications on board the vessel, or were proved by the declarations of Capt. *Meany*. But his knowledge is entirely immaterial. If he did know it, he must be considered as an actor in these transactions; and if he did not know, it was owing to *his default*, that letters of advice, or any other document, or papers were taken on board which would jeopard the neutrality of his vessel, and subject her to forfeiture and confiscation. He had a right to guard himself against the reception on board of every document, letter, or paper, which could tinge his property with a belligerent stain, and having the right, it was his duty to do so, and being his duty, it was his default in having them there. So, that viewing the case in any light, if these transactions converted the vessel from a neutral into a belligerent, the act, or the default of the captain was the *efficient cause of condemnation.*

We have said, that the act or default of the master was the efficient cause of condemnation; this general expression however, we desire should be taken with this qualification, that the sentence proceeded upon the ground that the ship was by such act or default converted into a belligerent transport, or lost her character as a neutral; if this be not the fair interpretation of it, but it did actually proceed upon the ground of contraband, it would be a risk, expressly covered, and all the acts and proceedings of the master in relation to the shipment, &c. so far from being any default on his part, would have been proceedings in furtherance of the objects of a legitimate neutral voyage, and covered by the stipulations of the parties. The contraband

character of the shipment being in that case the efficient cause of condemnation, and not any act or default of the master, changing the character of the thing insured.

And here we are led to the inquiry, what was this ground of condemnation? and particularly its nature and character, as effecting the matter in controversy between the parties to this suit?

Before we proceed to an examination of the facts averred in the sentence, it may be well to fix certain principles in order to enable us to arrive at proper conclusions from the facts.

The policy of the nation is especially that of a neutral. It is dictated by the habits of our people, the character of our institutions, and our remote and local condition. Whatever discrepancy, therefore, there may exist among the writers upon inter-national law, upon the subject of the lawfulness of a contraband trade, it should be the duty of courts of justice, looking to this essential policy of the nation, to maintain such doctrines as would be calculated to extend our trade, not to limit and restrain it, provided such doctrines can be supported by writers of acknowledged authority. *Vattel,* 402. Although he admits the right of belligerents to confiscate contraband goods, he seems as implicitly to admit, the right of a neutral nation to trade in all articles in time of war, which she could in time of peace. He says, the nation at war does not oppose the right of the neutral. It only exercises its own right of confiscation, and if the rights clash with, and reciprocally injure each other, it flows from the effect of an inevitable necessity: That it is a collision which happens every day in war. *Azumi* altogether denies the right of confiscation, except where the commerce in contraband is carried to places under the dominion and control of the enemy of the nation with whom she trades, unless permitted by some conventional law. But conceding the right of confiscation, derived from the tacit consent of nations, the right and lawfulness of trade in contraband is not impaired. Acting in conformity with these

views, the courts of *Massachussetts* and *New York* have declared the lawfulness of contraband shipments, and of course, that the risk of such shipments may be rightfully undertaken by the underwriter. Following up this prinple, and conceding that a neutral, having nothing to do with the war, should be at liberty to exercise his accustomed trade in time of war, which he enjoyed in peace, would it not follow that the neutral had a right to ship contraband, with a view to a sale to one of the belligerents, in the same manner that he enjoyed that right in time of peace, and as he unquestionably enjoys it, where sales are in contemplation to the private subjects of such belligerent? No reason exists in the one case, for a condemnation of the shipment, more than in the other. The neutral shipper cannot be presumed to have imbibed a partiality for one of the nations at war, in the one case more than in the other, for both must be considered as undertaken for purposes of gain merely. And what is there in the different destination of such a cargo, that could mark one as contraband merely, and the other as hostile? Nothing surely, for in each case the shipper must know that his cannon and other munitions of war will be hostilely employed. In the one case, it is true, the government procures them directly, and in the other, indirectly, but his strength consists as much in the material of war in the hands of his subjects, as if he had them in his own military store houses. There is no principle growing out of the necessity of a belligerent, or his safety as a nation, which would lead us to denounce as hostile and unlawful, the cargo in the one case, more than in the other. They are in truth, both merely contraband shipments, and as neutral property, liable to capture and condemnation.

But let us suppose, that, in virtue of the consignment, the property, by delivery, became the property of the consignees, then domiciled in a belligerent country, and that they were, therefore, by the laws of war, considered liable to capture and confiscation as enemie's property. This could

only affect the cargo, and could not endanger the ship; for a neutral ship may lawfully carry belligerent property.

As far as the sentence regards the shipment, whether that shipment be considered as contraband, and the property of the neutral shipper, or as the consignee's property, and therefore enemy's property liable to capture and confiscation; the case presents no difficulties; for, in either point of view, the cargo was within the terms of the policy, and covered by it, both the one and the other being a lawful trade, and such as a neutral might rightfully embark in.

This shipment must be considered in the one light or the other. It cannot be viewed as government property, for the sentence avers the fact, that it was at the time of sailing the private property of the shippers, and it is not percieved, whatever may have been the ultimate view with regard to the cargo, how, during the voyage, it could have been divested from the shippers. The consignees had no control over it, until the delivery of the cargo, or of the bills of lading, and neither of course had taken place. So that it was, in fact, private property, and admitted to be private neutral property at the time of sailing. But let us see the object and purpose of the shipment. It seems to have had an alternative destination, dependent on the contingency of the existence of a blockade of the port of *La Guira.* If that port was not blockaded, it was to be delivered to the consignees, in order that certain intentions of Mr. *Zea,* the agent of *Colombia,* resident in *London,* might be carried into effect, in putting the squadron on a more respectable footing; that a brig of war might be armed, and that a depot of munitions might be established at *La Guira* for the public service. Now, however strong this language may be, as indicating a shipment in fact for the *Colombian* government, it seems to be negatived by two considerations, which demonstrate a shipment in the first place, merely with a view to a sale to government; and in the second place, with a view to a general sale for the benefit of the owners, or in other words a mere commercial voyage, undertaken for

commercial gain by private property holders. The property is averred, at the time of sailing, to be in the shippers; and if the port of *La Guira* was blockaded, the master had directions to bear away for *Santa Martha,* where the consignees were to dispose of the cargo at discretion, which terms, in their ordinary acceptation, would mean a sale of the cargo to the best advantage for the owners, without regard to the public or private character of the purchaser. These considerations negative a sale to the government of this property, and the whole sentence only goes to show, that the shippers had a prospect, derived from the communications of Mr. *Zea,* of a sale to government, if the vessel could reach *La Guira;* and if it should be blockaded, their consignees must dispose of it to whomsoever they could, to the best advantage for the shippers.

But let us suppose, that the cargo was shipped under a contract to become the property of the government of *Colombia* on delivery, and to be there paid for; and this is the most favorable light for the underwriters in which the ground assigned by the court can be viewed, as it declares, that at the time of sailing, the shipment was the property of the shippers, which it could not have been if the government had given an order for the cargo, and it had been delivered to the master, for in such a case the title to the property would have vested in the government considering it as the consignee. Then the cargo is neutrally owned, and is not belligerent. We are aware that the Prize Courts have determined that capture is equivalent to delivery, and that in consequence of it, the cargo would be confiscated as belligerent. But its neutral character is maintained up to the moment of capture, and the character of the cargo would be changed by no act over which the neutral owner *could have* any control, but by the technical principle of the laws of war, which substitutes in such case, the captor for the consignee, in order the more effectually to guard against the frauds of belligerent shipments, under the dress and appearance of neutral ownership. How far such a

shipment, thus consigned, after capture and condemnation, might falsify a warranty of neutrality, it is unnecessary to determine. It is sufficient here to say, that there is no war- ranty of neutrality, and a shipment of belligerent property, admitting it to be such, may be lawfully made by a neutral in the absence of any warranty or representation. But could it be seriously contended, that the principle above ad- verted to, could convert the neutral vessel into a bellige- rent transport? The vessel is transporting the property of neutrals, and is in their service, not in that of the govern- ment. She would seem to have no attribute of a hostile transport. If, by fiction of law, the property, from the mo- ment of capture, is considered as delivered, it would seem to be a singular extension of that principle to say, that by capture, the character of the vehicle is utterly changed from a neutral, commercial vessel, into a belligerent transport, when by the capture, the vessel is considered as having terminated her voyage and delivered her cargo. If the de- livery of her cargo to the enemy constituted her a trans- port, it might with the same propriety be maintained, that if this vessel had delivered her cargo at *La Guira*, and was on her return voyage, in ballast, or with an innocent cargo, that she was liable to condemnation as a belligerent trans- port. In such a case the position could not be maintained, nor can it be in the actual predicament of this ship, as dis- closed by the sentence.

Thus much with respect to the cargo. Any or all of these considerations existing, would have rendered it liable to capture and condemnation, either as contraband or as ene- my's property, but by the laws of war would not have af- fected the vessel. Indeed, if any of the circumstances at- tending this shipment could be considered as of so malig- nant and aggravating a character, as to have affected the vessel in the judicial eye of a Prize Court, and to have just- ly subjected her to forfeiture, still, these proceedings, and this trade, being all such as *a neutral might lawfully engage in*, must be supposed to have been contemplated by the

underwriter, is within the risk assumed, and he must be answerable.

The consideration of the transport character of the vessel must spring from the service in which she is engaged. Sir *William Scott* in the case of the *Friendship* says, that the hiring of a vessel by the agents of the belligerent, for the purpose of carrying stores in her service, constitutes her a transport. By this, he means, (and we collect his meaning as well from his words as the facts of the case he decides,) that such vessel is only a transport, if she carry the property of the government, and that in such a case she is equally a transport, as she would be if she carried a detachment of troops. There can be no doubt of the truth of this principle, but the considerations before urged go to show, that this vessel was in the pursuance of an ordinary, neutral, and commercial voyage, *neither hired by the government*, nor in *her service*, but in *the service of private individuals*, and there exists of course no foundation for considering her as a belligerent transport.

We have stated that it was clearly inferable from the sentence, that the shipment in the first instance was made with a view to a sale to the government by the consignees, and no doubt their instructions, in case of the vessel's reaching *La Guira*, were to that effect. But this design could not make her a transport. She must, to give her that character, *be employed to carry goods belonging to the belligerent. But "she was offered, in case she should be needed, to the Colombian government."* Now, suppose the vessel completely equipped for war, and built in a neutral State, whose laws did not forbid it, with intent to sell her to one of the belligerents, and she sails in pursuance of that intent, she would be only a contraband article, and such as might be lawfully transported by a neutral citizen, subject only to the conflicting right of *seizure in transitu*, and of *confiscation*, and such being the right of the neutral owner, the underwriter must look to the possibility of the existence of such an intent. He knows her destination is to a belliger-

ent port: He knows the structure of the vessel, and is bound to know the course of the trade, and all the incidents and dangers to which the vessel as a neutral may be subjected; clothing this part of the case in the worst possible garb for the assured, the underwriter would be responsible. This vessel was an ordinary ship, pursuing the usual avocations of commerce, with none of those dangerous characteristics which distinguish the vessel in *Robinson's* reports. It is true, like all other vessels engaged in that trade, she was originally built with some adaptation to warfare, but, from the time of her first structure, she had been employed in commercial voyages. She had not the distinctive marks of warlike offence which the *Brutus* had, but her predominant character was commercial; so that conceding that case to be law, this would not fall within its range.—But here, it is true she was to be contingently offered to the government, and considering her as an article *ancipitis usūs,* it might be proper to look to her contingent destination, as determining her character to be contraband. Considering then, the fact of her being offered to the government, as converting the ship into a contraband, still a neutral owner may lawfully transport his ship with a view to a sale, and there would be no forfeiture of even a warranty of neutrality by the existence of such an intent, accompanied by a sailing in pursuance thereof.

So far then, as this ground of condemnation is concerned, whether we consider that condemnation as lawless, except as regards the goods, or as justified by the aggravating circumstances attending the shipment, or upon the ground that the vessel herself was contraband, (and in any other light, we have endeavored to show it cannot be viewed,) the assured, by it, are not prevented from recovery, even although these various acts were done after the inception of the risk. For although they might have been the efficient cause of the condemnation of the vessel, we cannot consider them as flowing from the fault or default of the

owner of the vessel, or her captain, as they were all justifiable in the rightful pursuit of a lawful neutral voyage, and were of course, within the risks assumed.

The next cause of condemnation must be passed in review. The attempt of this vessel to break a blockade of the port of *La Guira.*

The principles applicable to this subject, it has been adjudged by the Supreme Court of *Pennsylvania,* 1 *Bin.* 293, and by the Supreme Court of the *United States,* 4 *Cranch.* 186, are correctly ascertained by the *British* treaty of 1794, and that it is, in exact conformity with the law of nations. Without mounting to a more distant source, we shall look to these cases, and to this treaty, as furnishing the law on the subject.

There must be notice to neutrals of the existence of a blockade. When the *Budget* sailed from *London,* it is clear from the sentence, that she did not know of the existence of a blockade, for she had orders, if there existed a blockade, to bear away for *Santa Martha.* This too, manifests the absence of a *sailing with intent to violate a blockade.* If *without notice she attempted* to enter, it was the duty of the blockading squadron *to have turned her away. The attempt, then, to enter without notice is not an offence,* but the offence which subjects to confiscation, is the *attempt to enter with notice,* or *after being turned away, again attempting to enter.*

Now the sentence is *prima facie* evidence of what it states, and all inferences which a rational mind can draw from such a statement, may legally and properly be deduced to uphold and sustain the legality of the ground. It states *an attempt to enter a blockaded port merely, unaccompanied* with *any assertion of notice, either actual or constructive.* It is then *prima facie* evidence of an attempt to enter a blockaded port, but *not of notice, not of a turning away.* This you *cannot* infer. We infer one fact from the proof of the existence of another fact, because the fact inferred, usually attends the fact proved. This princi-

ple is at the bottom of all the doctrine of inference and presumption. Now, the attempt to enter a besieged town regularly invested after notice, is an extraordinary occurrence, and the usual attendant of such attempts, instead of *notice*, is a *want of notice*. There is then, no ground of inference, no room for deduction; but looking at the instructions of the captain to bear away in case of a blockade, and accompany them, with the consideration of the notices usually governing men, and their customary conduct, the inference is directly and palpably the other way, that there did exist no actual notice—constructive notice there clearly was none. There is, then, nothing to leave to the jury upon this subject, and this furnishes no ground of condemnation. But if notice cannot be inferred from the ground condemnation, can you infer it from the *sentence of condemnation itself?* You may support the sentence by referring to the grounds of it, but we should doubt whether the reverse of the proposition is true. *The reasons must speak for themselves.* These show on the part of the assured, only an innocent act, because there is no notice. But suppose it for a moment to be ambiguous, no court has heretofore, that we are aware of, resorted to the sentence to explain the ambiguity, and to support and maintain the reasons; but in such case, they look into the proceedings, and the facts therein detailed and proven, to dissipate the doubt. Would we be bound to comity to foreign tribunals to infer a legal condemnation from an ambiguous ground? Would it not be an overstrained comity, looking to the actual practices of the prize tribunals of the *European* nations for the last forty years? Are we, in the face of the fact, that *Spain* has acknowledged that our property to the amount, at all events, of five millions of dollars, has been illegally condemned and confiscated, to proffer on our part this comity? With all these facts before us, with the remonstrances of our citizens for the last thirty years, against the violations of our neutral commerce on the part of nearly every maratime nation of *Europe*, (and which are now mat-

ters of history, having formed the basis of many negotiations,) if the mind would have an inclination, where there existed an ambiguity, it would be rather against the evidence than in favor of it.

It follows from the preceding views, that the prayers offered by the defendants' counsel must be rejected.

*Plaintiff's Exceptions.* 1. The defendants, to support the issue on their part, offered evidence to the jury, that the ship *Budget,* on which the policy in this cause was effected, at a sale made in pursuance of the condemnation of said ship at *Porto Rico,* was purchased by *John Meany,* her former captain, as the agent, and for the account of *Hugh Thompson,* in whom the interest in said ship, and her freight in this cause is averred; and also offered in evidence, that after the return of said ship to *Baltimore* from *Porto Rico,* she came into possession of *Thompson,* as owner thereof, and that he exercised acts of ownership in relation to said ship, and fitted her out, and despatched her on a foreign voyage, and was considered the owner of said vessel. Whereupon the plaintiff offered evidence to prove, that the said ship, at the sale under the condemnation at *Porto Rico* aforesaid, was purchased by said *Meany,* on his sole account, and not as the agent, or for the account of said *Thompson,* and that after the return of said ship to *Baltimore* from *Porto Rico* aforesaid, she was continually in the possession of said *Meany* as his property, and that he exercised acts of ownership in relation to said ship, and that the said *Thompson* never meddled with said ship, after her return, but as the agent of said *Meany.* And thereupon the defendants, by their counsel, prayed the opinion of the court to the jury, that if they should find from the evidence, that at the sale made by virtue of the decree of condemnation of the Prize Court at *Porto Rico,* in evidence in this cause, *John Meany,* who was the captain of said ship at the time of her capture, became the purchaser of said ship or the account of *Hugh Thompson,* and that said *Thomp-*

*son* affirmed and adopted the said purchase, as so made on his account, that the plaintiff is not entitled to recover in this action, as for a total loss on said ship; which opinion the court (HANSON, A. J.) gave, and so directed the jury. The plaintiff excepted.

2.—1. Upon the whole evidence stated in the preceding exceptions of the plaintiff and defendants, which is to be considered as a part of this, the plaintiff, by his counsel prayed the opinion and direction of the court to the jury, that if the jury find from the evidence, that after the condemnation of said vessel, captain *Meany*, at the sale at *Porto Rico*, made under said condemnation, became the purchaser of the said vessel, on account of the said *Thompson*, without any authority from the said *Hugh Thompson*, except what may be held to be incident to his office as captain of said ship, and that the said *Hugh Thompson* afterwards ratified and adopted the purchase of said *Meany*, and took possession of said vessel as his own, yet, that such purchase and adoption did not convert the total loss into a partial one, and does not bar the plaintiff from recovering in this cause as for a total loss of the said vessel. 2d. That the underwriters, if they can avail themselves in any way of such purchase and confirmation, can only claim as salvage, the difference between the actual value of the ship, at the time of the sale, and the sum paid for her by Capt. *Meany*. Which directions, and each of them, the court (HANSON, A. J.) refused to give. The plaintiff excepted.

It is agreed in this cause, that it shall go up, on the exceptions as agreed upon, on the part of both plaintiff and defendants, that in the event of the Court of Appeals deciding the plaintiff to be entitled to a total loss, then the verdict shall be amended, and entered for a total loss; but if the Court of Appeals should decide that the loss is an average, and not a total loss, then the verdict shall be amended, and entered for such sum as two persons, one chosen by each party, shall determine, &c.

The verdict and judgment were for the plaintiff, and an appeal was prayed by both parties to the Court of Appeals.

The causes were argued before EARLE, MARTIN, STEPHEN, and DORSEY, J.

R. B. Magruder, Purviance, Meredith, Martin and Wirt, for the underwriters, in their appeals, contended,

1. That the record, or copy of the record of the Prize Court of Porto Rico, which was rejected as evidence by the court below, was fit and proper evidence for the purpose of showing, that the original papers, of which copies and translations purport to be inserted in said record, were in the ship Budget at the time of her capture, and were acknowledged to have been so on board by the master of said ship, in his examination upon oath before the said Prize Court, and that the said record ought to have been received in evidence for that purpose by the court below.

2. The court below erred in admitting John D. Danels as a witness, for the purpose, and under the circumstances set forth in the defendant's third exception. Bell, et al. vs. Carstairs, 14 East. 392. Bolton vs. Gladstone, 5 East. 155. 1 Marsh. Ins. 428, 572, 435, note. Donaldson vs. Thompson, 1 Camp. N. P. 429. The act of 1813, ch. 164. 1 Phil. Ev. 232. 1 Stark. Ev. 147. Cooper vs. Smith, 15 East. 103. Lothian, et al. vs. Henderson, et al. 3 Bos. and Pul. 544.

3. The terms of the order for insurance, and of the policy, in this case, amount to a warranty, that the ship Budget was a neutral ship, bound upon a mercantile voyage, with a permission to carry some articles contraband of war, but in every other respect, to be employed, and navigated as a neutral ship. 1 Marsh. Ins. 350. Routledge vs. Burrell, 1 Hen. Black. 254. Ib. 257. Worsley vs. Wood, 6 Term. Rep. 710. Ib. 720. And the court, and not the jury, is to expound the contract. Ferris vs. Walsh, 5 Har. and Johns. 308. Horneyer vs. Lushington, 15

*East.* 51. *Worsley vs. Wood,* 6 *Term. Rep.* 718. No precise form of words is necessary to constitute a warranty, which may be implied by the court. *Goix vs. Low,* 1 *Johns. Cas.* 343. *Ib.* 341. *Duff vs. Lawrence,* 2 *Ib.* 170. *Philips on Ins.* 135. Such an implication may be made from the assertion, that the vessel was owned by an *American* citizen. *Stocker vs. Merrimack Co.* 6 *Mass. Rep.* 220. *Kimble vs. Rhinelander,* 3 *Johns.* Cas. 130. And such an inference was fairly deducible from the declaration, that *contraband* might be on board,—as contraband, can only be predicated of a neutral ship. *The Commercen,* 1 *Wheat. Rep.* 390. If there was a warranty, a literal, and not a mere substantial compliance was necessary. *De Hahn vs. Hartley,* 1 *Term. Rep.* 343. *Bean vs. Stupart, Doug.* 11.

4. If the terms of the order did not amount to a warranty, they did to a *representation* of the neutrality of the ship, and if it was untrue, the policy was discharged. 1 *Marsh. on Ins.* 450. *Phillips on Ins.* 82. *Goold vs. Shaw,* 1 *Johns. Cas.* 302.

5. The *Budget* being at the time of presenting the order for insurance, and at the date of the execution of the policy, an *American* vessel, owned by an *American* citizen, and merchant, resident in the city of *Baltimore;* or being a neutral ship in fact, and having sailed on the voyage insured, entirely laden with munitions of war, which were destined for the service of the *Colombian* government, and being in fact, destined to become herself a member of the *Colombian* squadron; and *Meany,* the captain, being destined to be employed in the naval service of said government, and a breach of blockade having been committed by said ship, compromitted her character, as an *American,* or neutral ship, or as a merchant ship, and by the commission of the said acts, or any of them, became a belligerent transport, or forfeited the character under which she was bound, according to the contract of insurance to sail, and conduct herself during the voyage, and so avoided the policy. The

sentence of condemnation is evidence of the facts upon which it was grounded. *Marshall vs. Parker*, 2 *Camp.* 69. 1 *Marsh. Ins.* 392, 424. 4 *Cranch.* 494. 6 *Taunt.* 375. *Everth vs. Hannam*, 1 *Serg. and Low.* 415. If in point of fact, the vessel has become the property of a belligerent owner, the words, "for whom it may concern," would not cover her. 3 *Taunt.* 285, 298. *Bell, et al. vs. Carstairs*, 14 *East.* 391. *Ib.* 393. *Oswell vs. Vigne*, 15 *East.* 70. *Ib.* 72. *Ib.* 74. *Ib.* 76. *Horneyer vs. Lushington, Ib.* 46. *Ib.* 49. *Slocker vs. Merrimack Co.* 6 *Mass. Rep.* 228, 229. *Goix vs. Low*, 1 *Johns. Cas.* 343. *Suckley vs. Delafield*, 2 *Caine's Ca. in Err.* 221. *Seamans vs. Loring, et al.* 1 *Mason* 141. *Phillips*, 113, 119. They referred also, in support of this point, to *The Orozimbo*, 6 *Robins.* 430. *The Commercen*, 1 *Wheat.* 382. *The Richmond*, 5 *Robins.* 290. *The Brutus, Ib.* 270. *Phillips*, 120. *Marine Ins. Co. vs. Woods*, 6 *Cranch.* 45.

6. A contract of insurance upon an *American* ship, the object of which contract was to protect the assured from a loss arising by a breach of blockade, would be void in law. *Taylor vs. Sumner*, 4 *Mass. Rep.* 58. *Seton & Co. vs. Low*, 1 *Johns. Cas.* 5. 1 *Marsh.* 181, 55, 56. *Phillips*, 35. *Evans' Essays*, 52. *The Vigilantia*, 1 *Robins.* 13. *The Flad Oyen, Ib.* 144. *The Henrick and Maria, Ib.* 146. 2 *Brown, Ad. Law*, 314. *Vattel*, 501.

7. If, however, such a contract of insurance would be valid according to the law of nations, there must be an *express* undertaking, to that effect, on the part of the underwriters. It cannot be implied. *Miller on Ins.* 136, 144, 179, 188. *Luckley vs. Delafield*, 2 *Caine's Cas.* 221.

8. The concealment, or failure on the part of the assured, to communicate to the underwriters, the facts set forth in the seventh and eighth prayers of the defendants, was a concealment of circumstances material to the risk, if the jury believed the facts set forth, and vitiated the policy in this case. 2 *Marsh.* 461. *Kohne vs. Ins. Co. of N. A.*, 1 *Wash. C. C. Rep.* 93. *Ib.* 123. *Ib.* 158. *Coxe Dig.* 386.

It is no answer to say, that the plaintiffs had no knowledge of these circumstances themselves. They are responsible for the knowledge of *Meany*, and are to be dealt with, as though every circumstance known to him, had been known to them. *Hughes on Ins.* 350, 354. *Fitzherbert vs. Mather*, 1 *Dur. and East.* 12. *Gladston vs. King*, 1 *Maul. and Selw.* 35. *Gen. Int. Ins. Co. vs. Ruggles*, 12 *Wheat.* 409. 1 *Marsh.* 307, 481. 1 *Park.* 287, 319. *Carter vs. Boehm*, 3 *Burr. Rep.* 1905, 1909. 4 *Dows. Par. Cas.* 97. The risk was essentially increased in consequence of the cargo being wholly contraband, there being a wide difference between such a cargo, and a miscellaneous cargo having some contraband. In the one case, the entire freight and expenses are forfeited; in the other, only on the contraband articles. *The Nancy*, 3 *Rob.* 91. Besides, from the representations of the assured, there was a strong probability that the cargo would be entirely innocent. *Carter vs. Boehm*, 3 *Burr. Rep.* 1915. *Dows. Rep.* 97. It was presenting an alternative risk, when at the time, the assured knew there was no such alternative. That an insurance against all risks, and for whom it may concern, without any qualification, and standing alone, covers all risks, is admitted; but these terms may be controlled, not only by other parts of the policy, but by the order, or representation of the assured. *Urquhart vs. Barnard*, 1 *Taunt.* 450. *Macdonell vs. Fraser*, *Doug.* 260. *Neilson vs. D'Lacour*, 2 *Esp. Rep.* 619. *Buck & Hedrick vs. Chesapeake Ins. Co.* 1 *Peters*, 151. *Campbell et al. vs. Innes*, 4 *Barn. and Ald.* 422.

9. The failure to communicate to the underwriters, the facts set forth in these prayers; and the manner in which the assured did communicate other facts, amounted to a misrepresentation on their part, of facts material to the risk, and vitiated the policy. Considering the assured as having all the knowledge that *Meany* had, (and they are bound by it, whether actually known to them or not;) the question is, were they not guilty of a misrepresention where they

OF MARYLAND. 213

Maryland and Phœnix Insurance Companies vs. Bathurst.—1833.

said, there *might possibly* be some contraband articles on board, when they knew that she was not only to be entirely loaded with such articles, but that both ship and cargo were destined for the service of the *Colombian* government? According to the true state of the facts, the voyage was peculiarly perilous; when the information communicated to the underwriters was calculated to produce a belief, that the risk was an ordinary commercial risk, enhanced by a small quantity contraband articles. Independent of the forfeiture of the cargo, consequent upon a capture, under such circumstances, its destination to the agents of a belligerent government involved the forfeiture of the ship also, she being converted by such employment into a belligerent transport. *The Commercen,* 1 *Wheat.* 391, 392, 393. *The Friendship,* 6 *Robinson,* 425. *The Orozimbo, Ib.* 430.

The first exception of defendant's was abandoned.

Upon the plaintiff's exceptions, they argued, that the contract of insurance is a contract of *indemnity* merely, and that any act of the assured, after the vessel returns to this country, manifesting an intention to adopt the act of recovery as his own, is for the benefit of the underwriters, and converts a total, into a partial loss. 1 *Caine's Ca.* 296. *note, Ib.* 41, 42.

Up to the period of abandonment, the captain is the agent of the owner; subsequently, he is the agent of the underwriter. *Phillips,* 468. If subsequent to the abandonment, the assured purchase the property, he waives the abandonment and cannot recover for a total loss. *Ogden vs. the Fire Ins. Co.* 10 *Johns. Rep.* 179. *Ogden vs. the Fire Ins. Co.* 12 *Johns. Rep.* 31. After condemnation, a purchase by an agent, is for the benefit of the assured, or the underwriter, and not for that of the agent. *Oliver et al. vs. Newburyport Ins. Co.* 3 *Mass. Rep.* 64. *Unit. Ins. Co. vs. Robinson,* 2 *Caine's Cas.* 280. *Robinson & Hartshorne vs. Unit. Ins. Co.* 1 *Johns.* 592.

*Taney,* (Att'y Gen. U. S.) *Johnson, and Glenn,* for the assured.

*Second Exception.* As to admissibility of the record of condemnation, for the purpose for which it was offered.— Judgments in courts of admiralty in this respect, stand upon the same footing as domestic judgments, and though the latter are binding between the parties, and privies, the *evidence* upon which they are founded, is not admissible, in subsequent controversies, even between such parties.— *Karthaus vs. Owens, 2 Gill and Johns.* 445.

The only exceptions to the rule, are, when the witness, whose evidence is desired, is dead, then his very words must be proved; or when the fact to be proved, is in relation to pedigree. *Chirac vs. Reinicker,* 2 *Peters,* 613.— Upon the question of prize, or not, the judgments of courts of admiralty are binding upon all the world. *Croudson et al. vs. Leonard,* 4 *Cranch.* 436. Considering the judgments of courts of admiralty, in reference to the evidence upon which they were obtained, as domestic judgments, the rules applicable to the one, are applicable to the other, *The Marine Ins. Co. vs. Hodgson,* 6 *Cranch.* 206. The record was not offered to show the state of the pleadings, but to show, by the deposition of *Meany* in the Prize Court, that certain documents were on board at the time of the capture. For this purpose it was not admissible. *The Marine Ins. Co. vs. Hodgson,* 6 *Cranch.* 210. *Fitzsimmons vs. Newport Ins. Co.* 4 *Cranch.* 191. Besides, there are many papers in the record in question, which have nothing to do with this controversy; and as the defendant offered to read the whole without discrimination, if there were any not admissible, the court did right in rejecting the whole, though it might have been proper to read some one, or more. *Ellicott vs. Piersoll,* 1 *Peters,* 337.

*Third Exception.* If this exception can be maintained, we are carried back to the state of things which existed prior to the act of 1813, *ch.* 104. The plaintiff, as he went for a total loss on account of the condemnation, was bound to produce the sentence; and then, as is argued on the other side, he would lose his right to recover, if there should be

any thing in the sentence to show a breach of blockade, or any other violation of the contract, on the part of the assured. 7 *Cranch.* 432. And this would be the case, no matter how repugnant the sentence might be to the law of nations. It was this very evil which led to the passage of the act of 1813.

*Fourth Exception.* The form of the prayers in this exception is such, that unless the defendants are correct in each alternative, they cannot reverse the judgment; a distinct prayer not being made on each. They are all connected, and the prayers are based upon the truth of all the alternatives. If there is no evidence in support of any one, or the defendants in point of law are not entitled to all of the instructions prayed, they cannot have the benefit of any, though this court may think, they would be entitled to some of them, if they had been presented in the form of a distinct prayer. And it was incumbent on the defendants to show, that they had offered evidence in support of each of their alternative prayers, from which the facts assumed might be found by the jury. It was not the duty of the court to discriminate, and grant such as were right, and refuse the others ; but if some were wrong, they were justifiable in refusing the whole. *Newson vs. Douglass,* 7 *Harr. and Johns.* 417. *Elliott vs. Piersoll,* 1 *Peters,* 337, 338. *Allegre vs. Maryland Insurance Company,* 2 *Gill and Johns.* 136. But suppose the court should have separated these instructions, and decided them singly, still it is contended, that their judgment is correct.

1. A general policy against all risks, and for whom it may concern, covers all risks, contraband and belligerent. *Hagedorn vs. Oliverson,* 2 *Maul. and Selw.* 485. *Buck and Hedrick vs. Chesapeake Insurance Co.* 1 *Peters,* 151. *Allegre vs. The Maryland Ins. Co.* 2 *Gill and Johns.* 163. *Hodgson vs. Marine Ins. Co.* 5 *Cranch.* 109. *Etting, et al. vs. Scott and Seamen,* 2 *Johns. Rep.* 162. It follows therefore, that the failure of the assured, to communicate

to the underwriters, that he intends to carry a contraband or belligerent cargo, can have no effect upon the policy ; as the very terms of the contract are evidence of such an intention.    *Carter vs. Boehm*, 3 *Burr. Rep.* 1911.

A party would never ask for an insurance against all risks, unless he contemplated the probability of a contraband or belligerent cargo, as it would be useless to enhance the premium.    *Buck and Hedrick vs. The Chesapeake Ins. Co.* 1 *Peters,* 160.  The case at bar, is stronger than the case in 1 *Peters,* as it is manifest from the order of this case, that the assured did not, and could not know, of what the cargo would consist, nor to whom it would belong, and as a prudent man, he could only effect such an insurance, as would embrace perils of every description.  In the order of the 9th of October, asking for insurance against all risks, and for whom it may concern, nothing is said about contraband, or from which a neutral character could be inferred; and consequently the risk asked, was a belligerent risk, of which the underwriters are treated, as having knowledge.   If the case stood upon that order, it would be free from all doubt, upon the authority of the case of *Buck and Hedrick* in 1 *Peters.*   That the explanatory order of the 10th, did not, in the opinion of the underwriters, change the character of the risk, and reduce it from a war, to a peace risk, is proved by their refusal to reduce the premium.   There was then, no deceit in the second order, and all parties considered the risk as remaining as it was before.

The second order was submitted, because some of the *Baltimore* policies contained a warranty against contraband, which if introduced must be complied with, whether material or not.   A good reason then existing for the second order, why should the language of it be strained beyond the evident intention of the parties, which clearly was, to be covered against all risks, or why should the legal operation of the former order be restrained, by an act designed to enlarge it ?  To construe the last order as a representation, or warranty of neutrality, would be to convert the

risk into a mere peace risk, when the assured was asking for, and paying the premium of a war risk. If none of the *Baltimore* policies contained a warranty against contraband, and there was no proof of a usage on the subject, it might be difficult to account for the second order. But as the proof is, the object is manifest, and perfectly consistent with the declared desire, to be covered against all risks. It is impossible to consider this last order as amounting to a misrepresentation. The assured fairly and truly told the underwriter all he knew, and in terms to awaken his apprehension, and put him on his guard ; and the premium charged, shows, he was on his guard. The order in this case, cannot be considered as a representation of neutrality; for although *contraband* cannot be predicated of a neutral ship, here it does not *expressly* assert that there will be *contraband* on board, but that there *possibly* may be, and hence, a belligerent character might fairly be inferred.

If the defendants did not mean to insure a war risk, it was their duty so to have stipulated, and reduced the premium accordingly. *2 Johns. Rep.* 163.

The order here at farthest, can only be considered, as the representation of an expectation or belief, when the situation of the parties, with reference to the vessel, is taken into view. *Allegre vs. The Maryland Ins. Co. 2 Gill and Johns.* 136, 159. The implication of neutrality, from the words of the order, not being necessary and inevitable, a warranty cannot be inferred. *Slight vs. Rhinelander*, 1 *Johns. Rep.* 192. *Philips*, 82.

It is said that the knowledge of *Meany*, the captain, is to be imputed to the assured, the knowledge of the agent being the knowledge of the principal. This, though true perhaps, as a general rule, is not applicable to a case like the present, where from the relative situation of the parties to each other, such common intelligence was impossible. If the rule was universal, then the principal never could insure a lost vessel, if such loss was known to the master. *Genl. Int. Ins. Co. vs. Ruggles, 12 Wheat.* 408. Again,

when the agent is in one country, and the principal in another, without knowledge in fact, and so tells the underwriter, can it be said, that he shall be so affected by the agent's knowledge, as to forfeit his policy ?  When he says to the underwriter that he has no knowledge, he puts him on his guard, and the premium is regulated accordingly.

If, however, these parties are to be affected with the knowledge of *Meany*, the policy being against all risks, and for whom it may concern, is nevertheless good.  *Buck and Hedrick vs. Chesapeake Ins. Co.* 1 *Peters*, 161.

The *third* and *fourth* prayers assume, that if the ship was neutral at the time the policy was effected, she must remain neutral throughout the voyage.  But this is not so.  If it was, then, if by a subsequent declaration of war, a vessel, neutral at the time of the insurance, should become a belligerent, the policy would be gone.

It is necessary that a ship should be documented according to her national character ; and the rule on this subject has nothing to do with neutrality.  *Horneyer vs. Lushington*, 15 *East.* 46.  *Oswell vs. Vigne, Ib.* 70.  *Bell vs. Broomfield, Ib.* 364.

But there is no evidence to show the belligerent character of the ship, or upon which a prayer, with such an assumption, could be founded.  The evidence only shows her to have been a neutral, with contraband on board.  *Ludlow vs. Columbia Ins. Co.* 1 *Johns. Cas.* 337, 343.  *Ludlow vs. Brown and Eddy*, 1 *Johns. Rep.* 1.  *De Wolf vs. New York Fire Ins. Co.* 20 *Ib.* 214.

The *fifth* and *sixth* prayers assert, that the evidence of blockade, is contained in the sentence of condemnation, and the court was consequently called on to say, whether there was any such evidence in the sentence.  It was a question of law to be decided by the court.  Now, the sentence does not say that the captain had *knowledge* of the blockade, if in fact a blockade existed, nor does it say that he intended to violate it; and the mere attempt to enter a blockaded port, of which the party attempting has no knowledge,

does not avoid the policy. *Fitzsimmons vs. The Newport Ins. Co. 4 Cranch.* 185. *Ib.* 198. *Yeaton vs. Fry,* 5 *Cranch.* 435.

Upon the plaintiff's exceptions, they contended,

That in this country, after condemnation, the owner never can regain the property condemned, as of his former estate, though in *England,* the law is different by statute. 2 *Marsh. Ins.* 570, 573. If the former owner, after condemnation, comes into possession of the property, he does so by a new title. *Act of Congress, Dec.* 31, 1792, *sec.* 13, and June 27th, 1797, *sec.* 1. *Williams vs. Armoyd,* 7 *Cranch.* 423. *Ib.* 432. *Hudson vs. Guestier,* 6 *Ib.* 285. *Jumel and Desobry vs. Mar. Ins. Co.* 7 *Johns. Rep.* 422, 423, 426. *McIver vs. Henderson,* 4 *Maul. & Selw.* 576. *Hallett vs. Peyton,* 1 *Caine's Cas.* 42. 2 *Shower,* 242. 2 *Marsh.* 501. *Havelock vs. Rockwood,* 8 *Dur. and East.* 270. And when the loss is total, there is no necessity for an abandonment, because then there is nothing which the abandonment could vest in the underwriters. 2 *Marsh.* 559.

The condemnation of the vessel in this case is equivalent to a total loss, and consequently the abandonment by the assured, conveyed no title to the underwriter. There was in fact nothing to abandon; nothing upon which it could operate. How then, can it be said, that the conduct of the assured afterwards, is a waiver of the abandonment? If the abandonment conferred no title upon the insurer, there was nothing to waive; and nothing with which the subsequent conduct of the assured can be said to have been inconsistent. 3 *Mason,* 86. 5 *Johns. Rep.* 324.

Even if *Meany* had purchased as the agent of *Thompson,* the plaintiff's right to recover for a total loss would be unquestionable; because, he purchased from those, to whom the title had passed by the condemnation and sale of the vessel, and a title thus acquired would not have been incompatible with the rights of the insurers. Such, however, was not the case, as after the condemnation, *Meany* ceased to be the agent of the assured. 2 *Wheat.* 412. 414.

They referred to the correspondence between the parties, to show, that they did not suppose the plaintiffs had forfeited their right to recover for a total loss, by their adoption of the purchase by *Meany*. The refusal by the underwriters to pay, was placed upon other and distinct grounds. If they had a right to the vessel, they waived it by their omission to assert it in a reasonable time, and after full notice.

Dorsey, J., delivered the opinion of the court.

The first exception on the part of the Insurance Company, relative to the insufficiency of the preliminary proof having been abandoned, we are called to the consideration of the question raised on their second bill of exceptions; viz. Is the copy of the record of the prize court of *Porto Rico* competent evidence, "for the purpose of showing that the original papers, of which copies and translations, purporting to be inserted in said record, were on board the said ship *Budget*, at the time of her capture, and were acknowledged to have been so on board by the said *Meany*, the captain of said ship, in his examination upon oath, before the said Prize Court?" With the decision made by the county court on this question we fully concur.

The sentence of condemnation of the foreign prize court is evidence of the facts, which it purports to decide, in an action on a policy of insurance on the thing condemned ; and was conclusive evidence thereof, until the act of assembly of 1813, *ch.* 164, reduced it to the character of mere *prima facie* proof.

But the proof upon which such sentence may have been predicated, is not, *per se*, admissible in such collateral action.

The utmost efficacy that could be given to it, would be, to permit it to have the same effect, as if taken in a former cause between the present litigant parties. When viewed in that light, it is clearly inadmissible, there being nothing in the record to show the impracticability of procuring in the usual way, the testimony of captain *Meany*, or the ori--

ginal papers referred to, or the testimony of the witnesses, who deposed that such papers were on board the *Budget.* The competency of the evidence offered, through *John D. Daniels,* forms the subject of our examination in the third bill of exceptions. And its offer is predicated upon the assumption, that a breach of blockade, was one of the grounds of condemnation, alleged in the sentence. The objection urged to the testimony is, that *Thompson & Bathurst* having given the sentence in evidence to the jury, could not subsequently be permitted to contradict, by the examinaton of witnesses, any of the facts which it professes to establish. There would be a semblance of reason and plausibility in this objection, if *Thompson & Bathurst* had offered the sentence as evidence of the truth of the allegations on which it professes to be founded. But the reverse is the fact; it was offered for no such purpose. On the contrary, the offer under the circumstances in which it was made, distinctly announced to the court, and the *Insurance Company,* that those allegations, as far as they presented any barrier to the right of the plaintiffs below to recover, were denied, and would be disproved. The only object in producing the sentence, other than that of sustaining the abandonment, was to prove, that by the act of a foreign Prize Court, the insured had been deprived of all property in their ship. There is therefore, no inconsistency, no violation of the policy, nor any principle of law, in the sentence, and testimony of *Danels,* being offered as evidence by the same party. The sentence was the cause assigned for the abandonment, and must be proved; or the abandonment would be a nullity, and give no right of recovery as for a total loss. But say the counsel for the Insurance Company, there was no necessity for producing in evidence the sentence of condemnation, as proof of capture was sufficient. Does the law warrant this assertion? The plaintiffs abandoned, not because of the capture, but of the condemnation. Admitting they were notified of the capture at the time of its occurrence, of which there is no evidence, they

may have hoped, that the ship would have been released; and were therefore unwilling to relinquish to the insurer, the profits anticipated from the enterprize. Were they bound to have done so? Assuredly not. They waited the event, and abandoned on the ground of condemnation. If in a reasonable time after notice of capture, they failed to abandon, they lost the privilege of doing so, and could not have recovered for a total loss, on any abandonment for that cause subsequently made.

But the unanswerable objection to the argument is this; that no abandonment was made on the ground of capture, and consequently, the proof thereof would not entitle the insured to recover for a total loss. The principle *is not* now to be controverted, that in recovering for a total loss, founded on an abandonment, you must prove as the basis of your action, the cause assigned in the notice. Failing to do this, you cannot sustain your pretensions by proving another cause, which if made the subject of abandonment, would have warranted a recovery. The production of the sentence of condemnation, is therefore an indispensible link in the chain of testimony, requisite to the prosecution of a suit for a total loss, grounded on such an abandonment as that presented by the record before us. If the objection to the testimony be a sound one, *Thompson & Bathurst* were on the horns of a dilemma. To entitle them to recover they must produce the sentence, and the production of the sentence rendered a recovery impossible. To sanction the objection insisted on, would be judicially to repeal the act of 1813, and to give to the sentences of foreign Prize Courts, that conclusiveness of which by the act of 1813, they had been divested. That act declaring, " that no sentence, judgment, or decree, final, or interlocutory, of any judge, court, board, council, or tribunal, having or exercising municipal admiralty, or prize jurisdiction, without the limits of the *United States*, or its territories, shall be conclusive evidence in any case or controversy in the courts of this

State, of any fact, matter or thing contained, stated or expressed, except of the acts and doings of such foreign judge, court, board, council, or tribunal."

In the aspect in which this question was presented to the county court, their disposition of it is in accordance with the views of this court. But we deny the assumption upon which the objection was founded; viz: that the sentence disclosed a condemnation for the breach of blockade. The sentence states no such fact. It alleges that *La Guira*, the port of destination of the *Budget*, was on the 23d of December, the day of the condemnation, a blockaded port; but not that it was so at the time of the capture, or the attempt to enter it. The testimony of *Daniels* was on that account wholly irrelevant to any matter at issue in the cause; and the county court, on that ground erred, in over-ruling the objection to its going to the jury. But this error, being in its nature wholly immaterial, and having no tendency to influence the minds of the jury, in forming their verdict upon the matters really in issue before them, forms no ground for the reversal of the judgment rendered on the verdict.

The first branch of the first prayer, in the fourth bill of exceptions, is, "that the terms of the order for insurance and the policy, in this case amount to a warranty, that the ship *Budget* was a neutral ship, bound upon a mercantile voyage, with permission to carry some articles contraband of war, but in every respect to be employed and navigated as a neutral ship." To sustain this idea of warranty, the following endorsement on the order of insurance is relied on : viz: "although our advices give us no reason to believe there will be any articles contraband of war on board the ship *Budget*, still, as we wish to be covered against all possible risk, we request your reconsideration of the written application including articles contraband of war." This, say the counsel for the insurers, is equivalent to an express asseveration of neutrality, as articles contraband of war have neither meaning nor existence, but in reference to a neutral ship. Suppose this indissoluble connection, between arti-

cles contraband and a neutral ship be conceded; does the inference of warranty of neutrality in this case, necessarily follow? Can it be denied, that the original order covered belligerent as well as neutral risks? Was the endorsement on the order, intended to reduce the premium, by diminishing the risks insured against, to those of a neutral character only? Was it so understood by the underwriters? Their continuing to demand the same premium is unanswerable proof to the contrary.     Do the terms of the endorsement intimate such an intention? So far from it, they reiterate the contrary by renewing the same offer, and declaring their "wish to be covered against all possible risk." Do they in express terms, or by necessary inference assert, that there will be articles contraband of war on board? The reverse is the truth; they state that their advices give them no reason to believe that such will be the fact; but should such a contingency happen, they seek by insurance an indemnity against it.     In other words, the order in effect declares the *Budget* may be belligerent property; if so, we require protection against all perils, incident to her, in that character. Or she may be in point of fact neutral, in that event, we ask an indemnity against every casualty, not explicitly excepted, which may befal her as such.     It neither asserts her to be the one, nor the other, but provides an exemption from loss, let her condition in that respect be what it may.

That the original order, with the terms "against all risks," and "for account of all whom it may concern," covered both neutral and belligerent risks, has been admitted, and could not be denied.     Had it then been the design of the second offer, to reduce the liabilities of the underwriters to neutral risks only, and obtain a consequent reduction of the premium of insurance, it would not have omitted an express assertion or warranty of neutrality. In the rejection of this part of the said first prayer, we therefore concur with the county court.

By the remaining part of this first prayer, in the third bill of exceptions, the instruction required of the court,

was, that " if the jury find from all the evidence, and admissions in the cause, that the ship *Budget,* on the voyage insured, was entirely laden with munitions of war, and that the same were destined for the service of the *Colombian* government at *La Guira,* partly to arm a vessel of war called the *New Orleans* belonging to the said government, and in part to establish a *depot* of arms at *La Guira* for the service of the said government; or that if said ship was to be offered for sale to the *Colombian* government whenever she might be wanted; or that the said *Meany,* captain of the *Budget,* was to be employed in the naval service of said government; or that a breach of blockade was committed by the *Budget,* as set forth in the sentence of condemnation of the *Prize Court of Porto Rico;* that then the policy is violated, and the plaintiff is not entitled to recover." In *Buck & Hedrick vs. The Chesapeake Ins. Co.* 1 *Peters,* 159, the *Supreme Court of the United States* have declared, that " courts of justice are not bound to modify or fashion the instructions moved for by counsel, so as to bring them within the rules of law." If it were otherwise, instead of deciding the question submitted as presented by the counsel, they would in fact themselves become counsel, by raising the question, which as a court they must subsequently determine, and by analogy in every case it would be error, to reject a prayer asking more than the principles of law would warrant, unless at the same time the court gave an instruction, as favorable to the interest of the party praying, as if they were responding to a prayer aptly formed to elicit such instruction. The law, for wise reasons, imposes upon the court no such double and inconsistent duties of counsel and judge. They may, if they see fit, content themselves with a simple refusal of any prayer not sanctioned by the rules of law. The court below were therefore justified in an unqualified rejection of the said remaining part of the first prayer, because they were required to give it, if the jury were satisfied of the existence of any one

of four enumerated alternatives; one of which, (in relation to a breach of blockade,) was not a question which the court could have submitted to the finding of the jury, for the reasons stated in our opinion on the second bill of exceptions. But according to our view of the subject, the court would have been right in refusing the instruction prayed, though a separate prayer had been framed on each alternative.

In the case of *Buck & Hedrick vs. The Chesapeake Ins. Co.* before referred to, *the Supreme Court* say, "a knowledge of the state of the world, of the allegiance of particular countries, of the risks and embarrassments affecting their trade, of the course and incidents of the trade on which they insure, and the established import of the terms used in their contract, must necessarily be imputed to the underwriters." "No underwriter can be ignorant of the practice of neutrals to cover belligerent property under neutral names, or of the precautions ordinarily resorted to, that the cover may escape detection." Neither can the *Maryland* Insurance Company in this case, be deemed uninformed of the practice of chartering neutral vessels at *London,* and elsewhere, by the agents of the *Spanish South American* governments, for the transportation of military stores, and troops; nor of such vessels being sold to those agents, deliverable in *South America,* for the purpose of being there used as national cruisers. These were facts of universal notoriety in the commercial world, at the time of the insurance on the *Budget;* are a part of the public history of that epoch, against the light of which this court cannot shut their eyes, and of which the law imputes knowledge to the appellants. Nay, it is more than probable, if not apparent, that these were the belligerent perils, mainly contemplated by the parties in their compact of insurance; and against which the underwriters especially designed to indemnify.

It is admitted on both sides, that the *Budget,* until her arrival at *London,* was well known as an *American* ship;

and owned, commanded, and navigated as such. The letters of *Meany*, the captain, to his owners, communicated to the underwriters, and on which the policy was effected, informs them of what? That he had sold the ship? No. That he had "chartered" her to go "to one of the following ports in the *Colombian* government—*La Guira, Santa Martha or Carthagena.*" And upon these facts, with the aforementioned knowledge of the usage of neutrals in that trade, the underwriters were called on to insure the ship, against all possible perils that could betide her, either in a neutral or belligerent character. The asking of such an insurance, is of itself demonstration, that protection against dangers ordinarily incident to neutrality, was not all that was desired. To suppose that for such a limited liability, they offered (as they did,) more than double the premium necessary to the attainment of such an object, would be to impute to them a species of senseless prodigality, never before deemed applicable to an *American* merchant. The idea of the enhanced premium being paid on account of a *bona fide* regular belligerent ownership, is repudiated by the letter of *Meany*, on which the insurance company acted, when the policy was underwritten. That announced the chartering, not the sale of the *Budget*. What kind of belligerent risks were they then, for which, they designed to become responsible? The strong probability, if not the natural presumption is, that they assumed the liability for those very contingencies, for which they are now called upon to answer; and which were contemplated by both insurer and insured, from their knowledge of the character of the trade by neutrals from *London* to *Colombia.* No other rational motive could have prompted *Thompson & Bathurst* to have sought such an insurance; and the facts in the cause warrant the assumption, that the underwriters intentionally assumed the responsibility to the full extent into which they were invited to enter. Being uncertain, whether it could be called a neutral or a belligerent risk; where the ship, though in fact neutral, was in contem-

plation of law regarded as belligerent; *Thompson and Bathurst* required not only a cover, to neutral and belligerent ownership, but also against "all risks," or "all possible risk." Thus manifestly seeking to obtain security against other losses, than those which usually attend neutral and belligerent ownership. And such must have been the understanding of the insurance company, from the knowledge with which they are affected. In this view of the subject, we are more than sustained, by the case of *Goix vs. Knox*, 1 *Johns. Cases*, 340; where it is said, "the insuranse is against all risks." This expression is vague and indefinite; but if we allow it any force, it must be considered as creating a special insurance, and extending to other risks than are usually contemplated. We are inclined to give it a liberal construction, and apply it to all losses, except such as arise from the fraud of the insured. "The terms used are sufficiently broad to comprehend every other loss." This doctrine was affirmed in *Skidmore vs. Desdoity*, 2 *Johns. Cases*, 77.

We have so far, examined the effect of the order for insurance, in reference to the question of warranty of neutrality; and in doing so, have regarded it as incorporated in the policy. By the second prayer in the third bill of exceptions, the county court were required to give the same instruction to the jury, which was applied for in the first, except that the order for insurance in the first prayer was assumed to operate as a warranty, in the second as a representation. If when regarded as a warranty, the order for insurance, as we have endeavored to show, can afford no relief to the appellants, there is no pretext for an attempt to invoke it to their aid, when viewed in the light of a representation.

We approve of the county court's refusal, to grant the second, third and fourth prayers, for the same reasons which induced us to sanction their rejection of the first; and we sustain them in their denial of the fifth and sixth prayers upon the grounds, stated by us in the examination

of the second bill of exceptions. We also concur in opinion with the county court, in the rejection of the seventh, eighth and ninth prayers; believing that the assured were under no obligation to communicate existence of those facts, the concealment, or non-disclosure of which, is relied on as the ground for vacating the policy. In our remarks on the first prayer, in the third bill of exceptions, we have so construed the contract of insurance, as to fix upon the underwriters a liability for losses arising from the transportation of hostile stores, troops, &c. the facts alleged as unduly concealed. The obligation to disclose is limited to such facts, as would vary the risk, or nature of the contract. No communication need be made, of what is necessarily implied by the contract. Where the necessity of disclosure, when the insurers agreed to run the hazard of the very peril concealed? If the underwriters have assumed the risk, to which the ship may be subjected in transporting a cargo of hostile stores, can it be requisite, that they should be informed, that such a cargo is to be laden on board the ship? On an assurance for account of whom it may concern, is the assured bound to inform the assurer, that there exists a belligerent owner, or twenty of them, if there be so many? Assuredly not.

If the insurers designed to assume a mere neutral risk, (of which we cannot indulge a momentary belief,) they were not led into this error by the conduct of the insured. Every thing, short of express information to the contrary, was disclosed to them. They were told, that insurance was required "for all whom it may concern," against "all risks," or "all possible riks;" they were aware of the trade carried on by neutrals from *London* to *Colombia.* If under such circumstances, they neither charged an adequate premium, nor sought the further information requisite to lead their judgment to a just estimate of their responsibility, they must bear the consequences of their own misprision.

Having disclosed our views upon the exceptions taken, in behalf of the underwriters, we are now brought to the ex-

amination of the bills of exceptions on the part of the assured, which present the question, whether the total loss claimed, was converted into a partial loss, by *Meany's* purchase of the *Budget* for account of the owners, and their subsequent ratification thereof, as stated in the bills of exceptions.   To sustain the affirmative of this proposition, in addition to some *American* authorities on the subject, that part of *Ld. Mansfield's* opinion, in *Goss vs. Withers, 2 Burr.* 694, has been much relied on, which declares, that "the insurer runs the risk of the insured, and undertakes to bear the loss actually sustained, and can be liable to no more.   So that if after condemnation, the owner recover the ship in her complete condition, but has paid salvage, or been at any expense in getting her back, the insurer must bear the loss so actually sustained."   This may be sound doctrine in *England,* where it is held, that the right to recover for a total loss, is not made absolute by the state of facts, on which the abandonment is founded, continuing to exist at the date of the abandonment, but is dependent on subsequent events.   In this country, a different rule prevails.   The right to recover of the assurer, for a total loss is complete, if the loss which is its basis, continue at the time of the abandonment, and of this consummate right or privilege, the assured cannot, without default, be deprived, but by their consent expressed or implied.   Like other privileges, it may be waived by the insured, either in express terms, or by their acts inconsistent with its existence.

If after capture and abandonment, but before condemnation, a ship be ransomed by the captain, or retaken by the crew, or be recovered and delivered to the owners, who claim, and use her as their own, they possess her under no new title or right of property; their acts are the assertion of their original ownership, and therefore inconsistent with the abandonment, which if sustained, casts the right of property on the insurers.   Both cannot therefore stand together ; the necessary inference is, that the insured, by the resumption of their ownership, surrendered their rights

under the abandonment. But where a condemnation has taken place, the assured, apart from all statutory regulation on the subject, is divested of all property in the ship, and in it, if purchased by themselves, or their agents, they acquire a new and independent title to which their subsequent acts of ownership are imputable, and not to their original proprietary rights. An intention to waive the abandonment is not the natural inference from their conduct. There is no inconsistency in their claiming for a total loss under the abandonment, and asserting the right of property under the newly acquired title. As against all the world, save the underwriters, the assured as purchasers, have an incontrovertible title. And it is conclusive even against them, if they consented to its acquisition, or have waived the right to impeach it. We are aware, that this question has been apparently otherwise decided in some of the *United States*, and especially in *New York;* where in the honest zeal for the protection of insurers, it is respectfully suggested, they have stretched their doctrines upon this subject to an unjust invasion of the rights of the insured, and gone beyond what the policy, or analogies of the law would sanction. The principle contended for in the argument, as fairly deducible from the *New York* cases is, that the acceptance by the insured for his own benefit, of a purchase of the thing insured, made by the captain for account of his owner, is *per se*, a waiver of the abandonment; and converts the otherwise total, into a partial loss. To this universal and unqualified proposition, we cannot assent. Whilst we admit, that the law has wisely erected around insurers, an impenetrable barrier to fraud and injustice on the part of the insured, we insist, that in doing so, it has gone no further than the necessity of the occasion demanded, and, that it has not been unmindful of providing a like protection for the insured, against practices of a similar character emanating from the insurers. That whilst *uberrima fides* is exacted of the insured, a like course of conduct must be practiced by insurers. That to neither

party, is it permitted to do acts, the natural tendency of which is injustice, and imposition on the other.   We freely concede, that neither the insured in person, or through the instrumentality of others, either before, or after the condemnation of the thing insured, possesses, where an abandonment has been made, an unqualified right to become its purchaser, for their own benefit.   Such purchases, after condemnation, where a total loss is claimed, are ever subject to this qualification ; that the insurers have the right or privilege, if they see fit, to exercise it within a reasonable time after a knowledge of the purchase, to elect to become themselves the purchasers ; and if the insured refuse to surrender the bargain, the total is converted into a partial loss ; or in other words, the insurers, by their election, having made the thing insured their own, have a right to deduct from the plaintiff's claim, the amount of the insurance, first subtracting therefrom, the *quantum* of loss actually sustained by the insured, by reason of the perils insured against.   By an abandonment, the rights of the underwriters relate back to the date of the disaster, not of the abandonment.   All intermediate acts of the captain, and agents of the insured, inure to the benefit of the insurer.   Any purchase therefore made by such captain or agents, no matter for whose account, if in due season adopted by the underwriters, becomes their own.   This view of the subject, so consonant to reason, justice, and policy, is not without support from the decisions from *New York*, which have been relied on by the Insurance Com pany.   In *Robinson & Hartshorne vs. United Ins. Co.* 1 *Johns.* 611, *Woodworth*, of the Court of Errors of *New York*, says, " I subscribe to the correctness of the rule, that the insurers ought to decide immediately after notice, whether they will avail themselves of the purchase made by the agent."   In *Jumel and Desobry vs. Marine Ins. Co.* 7 *Johns.* 426, Chief Justice *Kent*, in delivering the opinion of the court, speaking of the repurchase of a vessel by the captain, for the benefit of the owner, says, the insurers

"have nothing to do with the purchase of the vessel, *unless at their election*, is a general principle of insurance, &c." and in *Ogden vs. Fire Ins. Co.* 10 *Johns*. 180, the court, in relation to a purchase made by the assured after abandonment, state, that "if he persevere in the claim for a total loss, he must surrender to the insurer the benefit of the purchase; and this rule is founded in sound policy, to prevent fraudulent speculations upon a loss, at the expense of the insurer."

The principle of law upon this subject as recognised by us, gives protection to both parties, and is founded on equal and reciprocal justice, as far as the nature of the case will admit of. Adopt the rule as contended for by the Insurance Company, and you deal unjustly by *Thompson & Bathurst*, by rendering them without their consent purchasers of the ship; not at the price they stipulated to pay, but perhaps at double that amount; at her valuation at the port of departure, not her value at the port of purchase. You also inflict a serious injury upon underwriters, by depriving them of all chance of being restored to the property condemned, or its value, at a reasonable salvage, through the instrumentality of the insured, or their agents, who would never become purchasers where no ray of hope was left them, of being permitted to enjoy any benefit by the purchase.

It is alleged, that unless the assured committed a fraud upon the underwriters, by an excessive valuation, they have no just ground to complain of the exercise of the right now claimed by the Insurance Company. But is the allegation well founded? Is it just, that the assured should receive their ship at the port of condemnation, at her full value, where she may be so surrounded by perils and difficulties, as not to be worth one-half of what she was, at the port of departure; or would have been, at the port of destination, to which her safe arrival had been guarantied? If in the navigation of the *Budget* from *Porto Rico to Baltimore*, or in attempting to complete the voyage insured,

after the purchase, she had been lost by any of the perils insured against, could *Thompson & Bathurst* have recovered, not only the entire valuation in the policy, but in addition thereto, the purchase money paid for the ship? Or indeed any thing but the loss, which had accrued to the time of the purchase? Unquestionably not. Is there then no ground for complaint, no hardship in the case, that *Thompson & Bathurst* after paying a full premium of indemnity for an entire voyage, should not be covered by the policy, for more than one-half of it? That by legal presumption, they are to be held, as restored to their property, which by necessary implication revives the policy for the voyage; and yet, that they are entitled to no further protection under it? The law raises presumptions to subserve the ends of justice; never to work such absurdity and injustice as would follow the presumption now insisted on.

That the election of the assurer to adopt the purchase, should be made without delay, after the knowledge of the sale, is so forcibly enjoined by the plainest dictates of reason and justice, that it can hardly be necessary to invoke, either reason, argument, or illustration, to its support. He surely ought not to be permitted to lie by, and speculate on contingencies, at the risk and cost of the assured. If the vessel arrive in safety from the port of sale, having evaded the perils by which she was beset, and turns out upon minute inspection to be of greater value than the price paid for her, or if she has earned freight, or been profitably employed, or there has been an improvement in the price of ships, then will the assurer claim the advantages of the purchase. But on the other hand, if the vessel should be unprofitably employed, lost, damaged, or from any other cause, become of less value than when sold, then would all the burthen be cast on the shoulders of the insured. With the re-purchase it would be alleged they had no concern. This would be playing a safe game for the underwriters, but a ruinous one to the assured, and wholly inconsistent with that frankness and fair dealing which pervades every branch of insurance law. This

*dictum* of Ld. *Mansfield* in *Goss and Withers*, to the extent now attempted to enforce it, has not been confirmed by any subsequent *English* adjudication: on the contrary, it is in direct opposition to the law, as admitted by *Ld. Kenyon*, and the counsel on both sides, in the case of *McMasters vs. Shoolbred*, 1 *Esp. Rep.* 237.

But concede for the moment that we are in error in the views we have stated, and that the general rule as established in *New York* be correct; viz: that the insurers have a right to regard a purchase of the subject matter of insurance, by the insured or their agents, after its condemnation, as a waiver of the abandonment, and a conversion of the total, into a partial loss. If the insurers agree that such purchase shall not be a waiver of the abandonment, and the assured unequivocally evince his intention not to waive it; or if by the acts of both parties, it plainly appears, that it was not the intention of either, that it should be so regarded; would the abandonment then be waived? Certainly not. The right of the underwriter so to regard it, is of that class of rights, which may be waived, or insisted on, at the election of their possessor. Did they elect to waive their right in this case? In our opinion the proof sufficiently establishes that fact. On the 12th of March, 1823, *Thompson & Bathurst* address a note to the underwriters, stating the receipt of advice from captain *Meany*, that he had purchased the *Budget* after her being condemned, and drawn on them for the amount; and desiring to know, if they might calculate on receiving from the appellants the amount insured in their office, at the time stipulated in the policy, ninety days from proof of loss. The nature of this communication cannot have been misinterpreted. It was an explicit avowal of a claim for the whole "amount insured," for a total loss; and it was so understood by the underwriters, who in their answer of the same date reply, "that not having seen captain *Meany's* protest, we cannot satisfactorily make you a reply, because on it mainly depends the ground for payment, which (when presented)

if found in order, the loss is payable ninety days after proof and adjustment thereof." They do not, in this letter, intimate any claim to the ship which had been purchased, or that instead of paying as demanded of them, the whole "amount insured," by reason of the purchase for the owners, their liability was limited to the price at which the ship was sold. The notice of abandonment had been given on the 6th of February, 1823, accompanied by a certified copy of the condemnation.

The object to be attained by the production of the protest, was to ascertain whether they were responsible at all ; not what was the measure of their responsibility. It could not possibly give any information as to the purchase, having been made long anterior. On the 7th of May, (the ninety days mentioned in the policy having expired) payment was again demanded of the Insurance Company, which they declined for want of documents to prove the loss : alleging, that "as the vessel is now here, no doubt they can be produced." On the 21st of May, the insured, after having presented all the documents they had received, address the underwiters a third time, urging the settlement of the loss, and offering to procure in a reasonable time, if possible, any other documents which might be deemed necessary to elucidate the condemnation of the ship. On the 24th of May the Insurance Company reply to this communication, offering to advance to the insured $4498 75, upon their and *Robert Oliver's* joint note at six months, bearing interest; and requiring them at the expiration of that time, or sooner, to furnish the following documents relative to the ship *Budget*, viz : the proceedings of the Court at *Porto Rico ;* the log book, or authenticated copy thereof; the charter party, or an authenticated copy : upon receipt of which, and their proving satisfactory, an adjustment of the loss was to take place. This proposition was manifestly made, (in accordance with usage) that the insured might sustain no injury by delay, but be put in possession of the identical amount he would be entiled to re-

ceive, upon producing the documents required, or as they alleged, customary proof of loss; upon the production of which, if satisfactory, the note demanded, was to be cancelled or given up. *Thompson & Bathurst,* in their letter to the underwriters of the 26th of May, say, "we consider the proofs already handed you, as fully establishing the capture and condemnation of the ship *Budget;* still, we do not hesitate in trying to procure the documents you have pointed out, and have therefore written for them by a vessel that sailed yesterday for *Porto Rico.* We should esteem it an accommodation, your now paying us the loss, in the same manner the *Phœnix* Insurance Company have done, viz: by giving our note for the same at six months date, with interest, *being as a security for our procuring such further documents as may be requisite ;* but we prefer forfeiting that temporary advantage, to giving a note in the manner you prescribe." On the 28th of May, the Insurance Company, in their answer to the last preceding letter, state, "that the proofs produced in the case of the ship *Budget* are not satisfactory, or such as are usually produced by the assured, in similar cases, to entitle the assured to claim a total loss. On that score we beg leave to refer you to our letter of the 24th, and what we verbally communicated some time ago. With respect to an accommodation, we have no objection to grant one to the extent treated of in our last, on your note with satisfactory security ; which is in conformity with the custom of this company, and from which we cannot deviate ; at the same time, we wish you to understand, that it is neither meant nor intended, as paying a loss, which in our opinion, is not fully established. Should you not approve of our terms, you will of course have to wait until the documents sent for are received, and when received, if satisfactory to this company, no unnecessary delay will be made in paying the loss." All the documents furnished, and those demanded, were for the purpose of satisfying the underwriters, whether they were liable for any loss. They could throw no light upon the question, whether their lia-

bility was for a total, or partial loss.    But for the purchase, made by captain *Meany* for the owners, that question could never have arisen.    The loss could not have been otherwise than total.    With respect to this purchase, the documents sought for were known to be silent.    Of the purchase, information had been given by the assured in their note of the 12th of March, 1823, and no further intelligence on that subject had been required.    On that head the underwriters were satisfied.    Their only dissatisfaction, their only objection to pay, as for a total loss, was, that the customary proof of loss, showing any liability on their part, had not been furnished.    And to indemnify the assured for the delay in the payment of their claim, they proposed to them the grant of a loan, for the precise amount insured, after deducting the premium note, and $1 25, the cost of the policy, cautiously providing that this accommodation should not be regarded "as paying a loss," solely on the ground, that a liability on their part had not been fully established. If they had designed, in the event of their being held responsible for the loss, to take to themselves the benefit of captain *Meany's* purchase, they ought, within a reasonable time after it was made known to them, to have announced their determination to do so.    Had this been done, *Thompson & Bathurst* might have repudiated the purchase made on their behalf, as they were under no legal obligation to sanction it.    They had a right to conclude, nay, they could draw no other conclusion from their correspondence with the underwriters, than that they were to be paid as for a total loss, as soon as they could make it appear that they had a right to recover any thing.    By such conduct, the underwriters are to be regarded as having waived the privilege of taking the purchase of *Meany* to themselves, or of relying on it as a waiver of the abandonment.    To permit them to do so at the time, and under the circumstances in which they claim to exercise this right, would be a fraud upon the assured; an act of injustice towards them which no judicial tribunal should countenance.

Concurring with the County Court, in their opinion on all the exceptions on the part of the defendants below, as far as concerns their appeal, we affirm the judgment; but dissenting from the opinions on the exceptions taken by the plaintiffs below, on their appeal the judgment is reversed, and judgment entered according to the agreement of the parties set forth in the record.

JUDGMENT ENTERED ACCORDINGLY AS FOR A TOTAL LOSS.